[No. 67085-4. En Banc.]
Argued March 9, 1999.    Decided June 10, 1999.

THE STATE OF WASHINGTON, *Respondent*, v. STEVE A. THEIN, *Petitioner*.

---

134

*Steinborn & Associates*, by *Jeffrey Steinborn*, for petitioner.

*Norm Maleng, Prosecuting Attorney*, and *Brian M. McDonald, Deputy*, for respondent.

JOHNSON, J. — The question in this appeal is whether probable cause existed to issue a warrant to search defendant's home. The affidavits in support of probable cause contained generalizations regarding the common habits of drug dealers. We are asked to decide whether these generalizations, standing alone, established probable cause, or whether the stated facts were otherwise sufficient to issue the warrant. The Court of Appeals found the search valid. We reverse.

## FACTS

Stephen Thein was arrested and convicted for possession of marijuana with intent to deliver and of defrauding a public utility after a search of his home at Southwest Austin Street in Seattle (Austin Street) uncovered a marijuana grow operation. Police believed Thein was a drug dealer based on evidence found in an earlier search at a different location.

Two affidavits of probable cause were offered in support of the warrant application.[1] The relevant facts contained in the affidavits are as follows. On April 13, 1995, the South King County Narcotics Task Force executed a search warrant on a residence located at South Brandon Street in Seattle (South Brandon). Through an informant, the police had conducted two controlled marijuana buys at the South Brandon residence. The suspect at the South Brandon address was Laurence McKone.

The South Brandon house consisted of an upper and a lower level. The upstairs served as a residence and the downstairs as a woodwork shop and storage area. McKone was arrested in the upper level residence area. There, police found over one-half pound of marijuana and associated packaging materials belonging to McKone. They also found several copies of money orders from McKone made out to Thein with the notation, "rent."

---

[1]Technically, the two affidavits were submitted as one, with the secondary affidavit attached to and incorporated by reference into the primary affidavit. For ease of reference, we treat them as two affidavits.

The downstairs portion of the South Brandon residence was divided into two rooms. The front room was the woodwork shop and the back room was the storage area. In the back storage area, police found materials they believed to be commonly associated with the cultivation of marijuana. These included fluorescent lights, halide bulbs, heat shields, bottles of carbon dioxide, electric timers, plant trays, a watering can, a fan, potting soil, a humidifier, and charcoal. Adjacent to these materials was a "Clean-air" system with a packing slip addressed to Stephen Thein at the South Brandon address (the location currently being searched).

In the front woodwork shop area, police found a box of nails addressed to Thein at his Austin Street address. Also in the woodwork shop area were two boxes of oil filters marked "90915-20001" and "Toyota." A quantity of waste oil and an unopened bottle of motor oil stood nearby. Upon later checking with an auto supply retailer, detectives learned the oil filters fit 1994 Toyota pickup trucks.

Next to the door used to enter the basement area was a trash can. (It is unclear from the affidavit whether the can was located inside or outside this door.) Inside the can was a plastic bag and, inside that bag, two yellow plastic bags. One of the yellow bags contained approximately five pounds of marijuana "shake," material typically pruned from cultivated plants. The other bag contained a round chunk of potting soil, apparently pulled from a potting container, and a used oil filter matching those found in the woodwork shop.

While the search at South Brandon was in process, a neighbor came to the residence to pick up auto parts from McKone. The neighbor told detectives the source of McKone's marijuana was a white male, approximately 40 years old, who drove a black Lexus and periodically visited the South Brandon address. Later, a woman arrived to buy marijuana from McKone. She told detectives McKone's landlord was a man named "Steve." She also stated "Steve" and a relative of "Steve's" named "Dave" sup-

plied McKone's marijuana. The woman told detectives McKone first met "Steve" about 11 years ago. She said McKone's marijuana business had recently picked up. She said the basement area of the South Brandon residence was controlled exclusively by "Steve" and he drove a black Lexus. At the debriefing following the search at South Brandon the police informant told officers McKone got his marijuana from his (McKone's) landlord and the landlord drove a black Lexus-type vehicle.

Incorporated by reference to the affidavit outlining the above facts was the affidavit supporting the South Brandon search. This earlier affidavit stated the power records of the South Brandon residence were in the name of William Bell and the landlord was listed as Mrs. Ray Bade.

In this earlier affidavit the police informant also explained that McKone (who the informant knew only as "Larry") received his marijuana from his landlord. The informant said McKone originally leased the South Brandon residence but had fallen behind on his payments and his "supplier" had taken over the payments and bought the South Brandon residence. The informant also told police McKone's supplier recently purchased a house on the northeast corner of South Brandon and 3rd Avenue South, and the "supplier" drove a "new black Lexus." Clerk's Papers at 72.

Upon checking with the state Department of Licensing, detectives learned Thein's full name was Stephen Anthony Thein. His address was listed as the Southwest Austin Street address in Seattle. He was the registered owner of a 1994 Toyota pickup truck, as well as a black 1994 Acura Legend. According to Department of Licensing records, Thein did not own a Lexus.

Both affidavits contained generalized statements of belief regarding the common habits of drug dealers. The primary affidavit reads:

> Based on my experience and training, as well as the corporate knowledge and experience of other fellow law enforcement officers, I am aware that it is generally a common practice for

drug traffickers to store at least a portion of their drug inventory and drug related paraphernalia in their common residences. It is generally a common practice for drug traffickers to maintain in their residences records relating to drug trafficking activities, including records maintained on personal computers. Because drug traffickers will in many instances "front" (i.e., sell on consignment) controlled substances in full or partial quantities to their distributors or from their suppliers, such record keeping is necessary to keep track of amounts paid and owed. These records will also be maintained close at hand so as to readily ascertain current balances. Telephone/address listings of clients must be maintained and immediately available in order to efficiently conduct their drug trafficking business. Moreover, it is generally a common practice for traffickers to conceal at their residences large sums of money, either the proceeds of drug sales or to utilized [sic] to purchase controlled substances. In this vein, drug traffickers typically make use of currency, wire transfers, cashiers checks and money orders to pay for controlled substances. Evidence of such financial transactions and records related to incoming expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

I know from previous training and experiences that it is common practice for drug traffickers to maintain firearms, other weapons and ammunition in their residences for the purpose of protecting their drug inventory and drug proceeds[.] I am aware from my own experience and training that it is common practice for [sic] from law enforcement, but more commonly, from other drug traffickers who may attempt to "rip them off." Firearms and ammunition have been recovered in the majority of residence searches in the drug investigations in which I have been involved.

Clerk's Papers at 68.

Based on the foregoing facts, information, and belief, police concluded Stephen Thein was "currently involved in the manufacture and distribution of marijuana . . . and that evidence of these crimes is located at his residence of . . . SW Austin, Seattle WA." Clerk's Papers at 66.

A magistrate issued a warrant to search the Austin Street

.

residence. Before trial, Thein moved to suppress evidence found as a result of that search. He argued the facts and information discovered during the search of the South Brandon residence provided an insufficient nexus between the evidence to be seized (manufacture and distribution of marijuana) and the place to be searched (his Austin Street residence). He argued police did not have probable cause to believe he was involved in a grow operation, but even if they did, there was no evidence connecting any illegal activity to his Austin Street residence.[2] The trial court denied the motion to suppress and Thein was convicted on stipulated facts. He appealed only the suppression issue. The Court of Appeals affirmed. *State v. Thein*, 91 Wn. App. 476, 957 P.2d 1261 (1998).

We granted review.

## ANALYSIS

A search warrant may issue only upon a determination of probable cause. *State v. Cole*, 128 Wn.2d 262, 286, 906 P.2d 925 (1995). An application for a warrant must state the underlying facts and circumstances on which it is based in order to facilitate a detached and independent evaluation of the evidence by the issuing magistrate. *State v. Smith*, 93 Wn.2d 329, 352, 610 P.2d 869 (1980); *State v. Helmka*, 86 Wn.2d 91, 92-93, 542 P.2d 115 (1975). Probable cause exists if the affidavit in support of the warrant sets forth facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime can be found at the place to be searched. *Cole*, 128 Wn.2d at 286; *State v. Dalton*, 73 Wn. App. 132, 136, 868 P.2d 873 (1994). Accordingly, "probable cause requires a nexus between criminal activity and the item to be seized, and also a nexus between the item to be seized and the place to be searched." *State v. Goble*, 88 Wn. App. 503, 509, 945 P.2d 263 (1997) (citing WAYNE R. LaFAVE, SEARCH AND SEIZURE § 3.7(d), at 372 (3d ed. 1996)).

---

[2]Based on our disposition of this case, we do not address Thein's argument that police did not have cause to believe he was probably a drug dealer.

The State presents the same argument here that it made to the Court of Appeals. Namely, that a nexus is established between the items to be seized and the place to be searched where there is sufficient evidence to believe a suspect is probably involved in drug dealing and the suspect resides at the place to be searched. According to the State, "a search warrant is properly issued at a drug trafficker's residence even absent proof of criminal activity at the residence." Br. of Resp't at 16. Essentially, the State urges us to adopt a per se rule that if the magistrate determines a person is probably a drug dealer, then a finding of probable cause to search that person's residence automatically follows.

Our courts of appeals are split on the issue. In *State v. Rangitsch*, 40 Wn. App. 771, 700 P.2d 382 (1985), the defendant was arrested and charged with five counts of negligent homicide following a three-car collision. After evidence and testimony revealed the defendant was under the influence of drugs at the time of the accident and was a habitual drug user, police obtained a warrant to search the defendant's home for drugs. Probable cause was based exclusively on the officer affiant's statement that cocaine users would commonly have cocaine and drug paraphernalia in their homes and vehicles. *Rangitsch*, 40 Wn. App. at 774. Division One reversed, holding "the officer's belief that habitual users of drugs keep drugs and paraphernalia in their home was mere speculation. It was not sufficient to establish probable cause." *Rangitsch*, 40 Wn. App. at 780.

Conversely, in *State v. Gross*, 57 Wn. App. 549, 552-53, 789 P.2d 317 (1990), a Division One panel specifically distinguished *Rangitsch*. In *Gross*, a Federal Express package was intercepted and found to contain marijuana and hashish. The package also contained a letter stating that future packages would be less frequent but would contain larger quantities of drugs. The sender stated the mail was now too dangerous to use and he believed his telephone was tapped. The sender also requested payment by check rather than cash. *Gross*, 57 Wn. App. at 550-52. Upon

learning the address and identification of the sender from the addressee, a warrant was issued for the residence of the sender. *Gross*, 57 Wn. App. at 552. The court distinguished *Rangitsch* on the basis that drug trafficking, as opposed to habitual use, is a much greater evil and thereby increases the governmental justification for the search. *Gross*, 57 Wn. App. at 553. Nevertheless, the court took pains to highlight the evidentiary nexus between the evidence to be found and the place to be searched. *See Gross*, 57 Wn. App. at 554 (noting defendant's letter had implicated him in ongoing drug trafficking; addressee knew where defendant lived, giving rise to inference that defendant's residence was his "business" address; payment by check, presumably through mail, would arrive at this residence; and defendant was probably referring to residence telephone being tapped).

In *State v. Dalton*, 73 Wn. App. 132, 139, 868 P.2d 873 (1994), Division Two reasoned that *Gross* was limited to its facts (i.e., the evidence established a nexus). In *Dalton*, three anonymous informants indicated Dalton was engaged in drug dealing. At least one informant provided Dalton's telephone number and home address. Police investigation corroborated this information. Based on a specific tip, police also corroborated that Dalton would be flying to Alaska. Later, police intercepted a package containing approximately eight pounds of marijuana addressed to Dalton's post office box in Alaska. *Dalton*, 73 Wn. App. at 133-35. Based on this evidence, a warrant to search Dalton's home was issued. *Dalton*, 73 Wn. App. at 135. There, police found a grow operation. The trial court denied a motion to suppress, reasoning that probable cause existed to conclude Dalton was engaged in the illegal shipment of marijuana, and "[t]here [was] probable cause to conclude that a dealer of marijuana would have evidence to that crime in his residence, vehicles and outbuildings." *Dalton*, 73 Wn. App. at 136. The Court of Appeals disagreed, holding there was no evidence from which an inference could be made that drugs would be found at Dalton's home. *Dalton*, 73 Wn. App. at 140. The court concluded that "[p]robable cause to believe

that a man has committed a crime on the street does not necessarily give rise to probable cause to search his home." *Dalton*, 73 Wn. App. at 140 (quoting *Commonwealth v. Kline*, 234 Pa. Super. 12, 17, 335 A.2d 361 (1975)).

Shortly thereafter, in a unanimous decision, Division Two expressly held that an officer's general conclusions regarding the habits of drug dealers was, standing alone, an insufficient basis upon which to premise a search of a suspected drug dealer's home:

> An officer's belief that persons who cultivate marijuana often keep records and materials in safe houses is not, in our judgment, a sufficient basis for the issuance of a warrant to search a residence of a person connected to the grow operation. If we adopted the position urged on us by the State we would be broadening, to an intolerable degree, the strict requirements that there be probable cause to believe that evidence of a crime will be discovered at a certain location. We conclude that, standing alone, an officer's belief that grow operators hide evidence at other premises under their control does not authorize a warrant to search those places.

*State v. Olson*, 73 Wn. App. 348, 357, 869 P.2d 110 (1994).

Just a few months later, Division One reached a contrary holding. *State v. O'Neil*, 74 Wn. App. 820, 879 P.2d 950 (1994). In a split decision, Division One extended its earlier reasoning in *Gross*, 57 Wn. App. 549, concluding it was reasonable to assume drug dealers would keep evidence of drug dealing in their homes. *O'Neil*, 74 Wn. App. at 825-27. In reaching its conclusion, the court explicitly recognized the affidavit of probable cause "contained no evidence of any criminal activity at the [defendant's residence] . . . ." *O'Neil*, 74 Wn. App. at 826. Authorization to search was based exclusively "upon an inference that defendant O'Neil resided there . . . ." *O'Neil*, 74 Wn. App. at 826. The court reasoned that "[f]ew places are more convenient for hiding contraband or evidence of criminal activity— and, therefore, more appropriate to search—than the suspect's home." *O'Neil*, 74 Wn. App. at 826. Accordingly, the court held a nexus is established between a suspect and

a residence if the affidavit provides probable cause to believe the suspect is involved in drug dealing *and the suspect is living there. O'Neil*, 74 Wn. App. at 825. The dissent noted that, despite two months of intensive surveillance, police had been unable to acquire evidence of criminal activity at the residence. *O'Neil*, 74 Wn. App. at 832 (Scholfield, J., dissenting).

Subsequently, Division Two reached a holding in keeping with *Dalton* and *Olson*, and contrary to *O'Neil. State v. Goble*, 88 Wn. App. 503, 512-13, 945 P.2d 263 (1997).[3] There, a confidential source informed police the defendant received illegal drugs through the mail. According to the source, the drugs were sent from California to a post office box in Morton, Washington. Later, police intercepted a package containing drugs and addressed to the defendant at the post office box. *Goble*, 88 Wn. App. at 504-05. The police then obtained a search warrant for the defendant's home. *Goble*, 88 Wn. App. at 505. Police planned to place the drug package back in the post office box and maintain continual surveillance until the recipient took possession and transported it to his residence. *Goble*, 88 Wn. App. at 505. A magistrate issued a warrant on the condition it be executed only if the package were actually transported to the defendant's home. *Goble*, 88 Wn. App. at 506-07. On appeal, the Court of Appeals held at the time the warrant was issued probable cause was lacking. *Goble*, 88 Wn. App. at 512. In a unanimous decision, the court reasoned:

> When the magistrate issued the warrant, he had no information that Goble had previously dealt drugs out of his house, rather than out of a different place (for example, a tavern, his car, or a public park). He had no information that Goble had previously stored drugs at his house, rather than in some other place (for example, his car, at his place of employment, at a friend's house, or buried in the woods). He had no information that Goble had previously transported drugs from [the post of-

[3]Although *Goble* addresses the issuance of an anticipatory warrant, which is not at issue here, we find its rationale directly on point for purposes of the present discussion.

fice box] to the house, or that Goble had previously said he intended to do so. In sum, he had no information from which to infer, at the time he issued the warrant, that Goble would take the package from the post office to his house, or that the package would probably be found in the house when the warrant was executed.

*Goble*, 88 Wn. App. at 512 (emphasis omitted).

Like our Court of Appeals' decisions, the cases from other jurisdictions are in conflict. For example, the Ninth Circuit has held that probable cause to believe a suspect has committed a crime "is not by itself adequate to secure a search warrant for the suspect's home." *United States v. Ramos*, 923 F.2d 1346, 1351 (9th Cir. 1991) (invalidating search of home of suspect in ongoing narcotic trafficking, where suspect's conduct did not show probability that evidence of drug activity would be found in his apartment or even allegation he was implicated in the drug enterprise) (citing *United States v. Flores*, 679 F.2d 173, 175 (9th Cir. 1982)). However, the Ninth Circuit has also recognized " ' "in the case of drug dealers, evidence is likely to be found where the dealers live." ' " *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993) (quoting *United States v. Terry*, 911 F.2d 272, 275 (9th Cir. 1990) (quoting *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986))). *See also United States v. Thomas*, 989 F.2d 1252, 1254-55 (D.C. Cir. 1993); *United States v. Restrepo*, 994 F.2d 173, 188-89 (5th Cir. 1993) (basing decision on good faith reliance on warrant and not deciding whether probable cause actually existed by virtue of officer's conclusions regarding habits of drug dealers); *State v. Godbersen*, 493 N.W.2d 852 (Iowa 1992) (where drugs found in car were packaged to indicate person was dealer there exists reasonable belief that the person kept drugs and other evidence in residence).

Most courts, however, require that a nexus between the items to be seized and the place to be searched must be established by specific facts; an officer's general conclusions are not enough. *See, e.g., United States v. Schultz*, 14 F.3d 1093, 1097 (6th Cir. 1994) (while officer's training and

experience may be considered in determining probable cause, it cannot substitute for the lack of an evidentiary nexus); *United States v. Lalor,* 996 F.2d 1578, 1582-83 (4th Cir. 1993) (although probable cause can be inferred from circumstances, including the nature of the item and where one might normally keep it, because no evidence connected drug activity to defendant's home the warrant was defective); *United States v. Rosario,* 918 F. Supp. 524, 531 (D. R.I. 1996) (to permit a search warrant based upon the self-avowed expertise of a law enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect); *United States v. Rios,* 881 F. Supp. 772, 776-77 (D. Conn. 1995) (officer's general averments based on training and experience do not, standing alone, constitute a substantial basis for the issuance of a search warrant); *State v. Ward,* 222 Wis. 2d 311, 588 N.W.2d 645 (Wis. Ct. App. 1998) (blanket inference that drug dealers keep incriminating evidence in their homes would relieve law enforcement of any responsibility to place before the magistrate the "underlying circumstances" which establish evidence of drug dealing will likely be found in the dealer's residence); *State v. Johnson,* 6 Neb. App. 817, 828, 578 N.W.2d 75 (1998) (no probable cause where supporting affidavit contained generalizations about the habits of drug dealers but no articulable facts showing these generalizations applied to defendant), *aff'd,* 256 Neb. 133, 589 N.W.2d 108 (1999); *State v. Kahn,* 555 N.W.2d 15, 18 (Minn. Ct. App. 1996) (requiring facts specifically linking drug activity to dealer's residence and rejecting generalizations regarding habits of drug dealers); *State v. Silvestri,* 136 N.H. 522, 527-28, 618 A.2d 821 (1992) (rejecting per se rule that if magistrate finds suspect is probably a drug dealer then probable cause to search that person's residence automatically follows).

We find the reasoning of *Rangitsch, Dalton, Olson,* and *Goble,* and similar cases from other jurisdictions, persuasive. These cases are consistent with our requirement that

a finding of probable cause must be grounded in fact. *State v. Cole*, 128 Wn.2d 262, 286, 906 P.2d 925 (1995); *State v. Smith*, 93 Wn.2d 329, 352, 610 P.2d 869 (1980); *State v. Helmka*, 86 Wn.2d 91, 92-93, 542 P.2d 115 (1975). This requirement is constitutionally prescribed because information that is not sufficiently grounded in fact is inherently unreliable and frustrates the detached and independent evaluative function of the magistrate. *See, e.g., State v. Jackson*, 102 Wn.2d 432, 436-37, 688 P.2d 136 (1984) (magistrate cannot perform constitutionally prescribed function unless affidavit includes underlying facts); *State v. Seagull*, 95 Wn.2d 898, 907, 632 P.2d 44 (1981) (it is the duty of the issuing magistrate to independently judge the persuasiveness of the evidence in order "to ascertain whether the warrant sought is being reasonably requested and on reasonable grounds."); *Smith*, 93 Wn.2d at 352 (application for warrant must state underlying facts and circumstances on which it is based).

Absent a sufficient basis in fact from which to conclude evidence of illegal activity will likely be found at the place to be searched, a reasonable nexus is not established as a matter of law. *See, e.g., Smith*, 93 Wn.2d at 352 ("if the affidavit or testimony reveals nothing more than a declaration of suspicion and belief, it is legally insufficient"); *Helmka*, 86 Wn.2d at 92 ("Probable cause cannot be made out by conclusory affidavits."); *State v. Patterson*, 83 Wn.2d 49, 52, 61, 515 P.2d 496 (1973) (record must show objective criteria going beyond the personal beliefs and suspicions of the applicants for the warrant).

In its argument to this court, the State relies primarily on *State v. O'Neil*, 74 Wn. App. 820, 879 P.2d 950 (1994), for the proposition it is reasonable to infer evidence of drug dealing will likely be found in the homes of drug dealers. We disagree with the reasoning of that case. As demonstrated above, our precedent requires probable cause be based on more than conclusory predictions. Blanket inferences of this kind substitute generalities for the required showing of reasonably specific "underlying circumstances"

that establish evidence of illegal activity will likely be found in the place to be searched in any particular case. We reiterate that "[p]robable cause to believe that a man has committed a crime . . . does not necessarily give rise to probable cause to search his home." *Dalton*, 73 Wn. App. at 140 (quoting *Kline*, 234 Pa. Super. at 17).

The rule the State proposes would broaden "to an intolerable degree" the strict requirement that probable cause to search a certain location must be based on a factual nexus between the *evidence* sought and the *place* to be searched. *State v. Olson*, 73 Wn. App. 348, 357, 869 P.2d 110 (1994). Such a rule would not only subvert fundamental constitutional protections but would be inconsistent with the approach and reasoning of our previous cases.

Similarly, the State's reliance on *State v. Graham*, 130 Wn.2d 711, 725, 927 P.2d 227, 65 A.L.R.5TH 773 (1996), for the proposition that officers may draw reasonable inferences based on their training and experience, is not well taken under the facts presented here. In *Graham*, officers personally observed the suspect in possession of packets that, from experience and training, they believed to contain rock cocaine. *Graham*, 130 Wn.2d at 725. The inference that the suspect was in actual possession of an illegal controlled substance was, therefore, drawn from specific facts and informed by experience. Conversely, this case involves nothing more than generalizations regarding the common habits of drug dealers and lacks any specific facts linking such illegal activity to the residence searched. *Compare State v. Mejia*, 111 Wn.2d 892, 898, 766 P.2d 454 (1989) (after police observed drug dealer leave meeting with informant, travel directly to the house in question, travel back to informant, and only then give informant cocaine, it was reasonable to infer that house contained cocaine).

We conclude the generalized statements contained in the affidavits in this case were, standing alone, insufficient to establish probable cause to search Thein's Austin Street residence. Although common sense and experience inform the inferences reasonably to be drawn from the facts, broad

generalizations do not alone establish probable cause. Accordingly, *State v. O'Neil*, 74 Wn. App. 820, 879 P.2d 950 (1994) is overruled. To the extent the rationale of *State v. Gross*, 57 Wn. App. 549, 553-54, 789 P.2d 317 (1990) is inconsistent with our holding, it is disapproved.

██ █ In concluding as we do, we emphasize that the existence of probable cause is to be evaluated on a case-by-case basis. *Helmka*, 86 Wn.2d at 93. Thus, general rules must be applied to specific factual situations. *Helmka*, 86 Wn.2d at 93. In each case, "the facts stated, the inferences to be drawn, and the specificity required must fall within the ambit of reasonableness."[4] *Helmka*, 86 Wn.2d at 93. General, exploratory searches are unreasonable, unauthorized, and invalid. *Helmka*, 86 Wn.2d at 93.

In the present case, the Court of Appeals correctly recognized that generalizations do not substitute for facts and investigation. *State v. Thein*, 91 Wn. App. 476, 485, 957 P.2d 1261 (1998). Nevertheless, the Court of Appeals determined probable cause to search Thein's Austin Street residence existed. *Thein*, 91 Wn. App. at 486-88. In reaching this conclusion, the court expressly disavowed any reliance on the generalized statements regarding the common habits of drug dealers. *Thein*, 91 Wn. App. at 487. However, our review of the record leads us to the conclusion probable cause did not exist.

---

[4]Thus, we distinguish *State v. Herzog*, 73 Wn. App. 34, 56, 867 P.2d 648 (1994), cited by the State, *on its underlying facts. Herzog* involved the rape of six women. At least three of the victims described the defendant as wearing a striped polo shirt. *Herzog*, 73 Wn. App. at 38-40. Based on detailed evidence, police arrested a suspect. After the arrest, police obtained a warrant to search the defendant's room for clothes and towels described by the victims. *Herzog*, 73 Wn. App. at 56. The evidence, therefore, connected specifically described personal items used repeatedly in the commission of multiple crimes to the defendant. We do not find it unreasonable to infer these items were in the possession of the defendant at his home. These were personal items of continuing utility and were not inherently incriminating. Under specific circumstances it may be reasonable to infer such items will likely be kept where the person lives. *See* WAYNE R. LaFAVE, SEARCH AND SEIZURE § 3.7(d), at 381-85 (3d ed. 1996) ("Where the object of the search is a weapon used in the [commission of a] crime or clothing worn at the time of the crime, the inference that the items are at the offender's residence is especially compelling, at least in those cases where the perpetrator is unaware that the victim has been able to identify him to police."). *See also State v. Condon*, 72 Wn. App. 638, 644, 865 P.2d 521 (1993).

We disagree with the Court of Appeals that the evidence and information gathered at South Brandon, and the reasonable inferences drawn therefrom, establishes a nexus between illegal drug activity and Thein's Austin Street residence. Indeed, in our review of the record we find no incriminating evidence linking drug activity to the Austin Street home.[5] The only evidence linked to the Austin Street residence is innocuous: a box of nails and vehicle registration. Thus, even assuming Thein was McKone's "supplier," none of the evidence found at South Brandon, nor any of the information supplied by the informants, linked this activity to the Austin Street residence.

We also disagree with the Court of Appeals' reasoning that since no grow operation was found at South Brandon, it was likely marijuana "would be found at the other place Thein controlled—his home." *Thein*, 91 Wn. App. at 487. The court's conclusion is not drawn from any independent evidence linking Thein's supposed drug dealing to his Austin Street residence (e.g., no observations of him leaving Austin Street with packages, no sealed windows, no power records, no other suspicious activity at Austin Street). As such, the court's conclusion amounts to a generalized conclusion that drug dealers are likely to keep evidence of illegal drug dealing in their homes.

▮ Nor do we find it reasonable to infer evidence is likely to be found in a certain location simply because police do not know where else to look for it. *Thein*, 91 Wn. App. at 487 (concluding evidence was likely to be found at Thein's home because this was "the only other place anyone knew it could be . . . ."). By this rationale, lack of investigation and fewer details might result in a warrant, whereas thorough investigation revealing more about the suspect—and, therefore, potentially more places to look—would not. In any case, the record establishes there *was* another place to

---

[5]The court states the packing slip on the Clean-air system discovered during the South Brandon search was addressed to Thein at Austin Street. *Thein*, 91 Wn. App. at 486. In fact, the packing slip was not addressed to the Austin Street address, but was addressed to South Brandon. Clerk's Papers at 64.

look. The affidavit contains evidence that Thein owned at least one more house, also located on South Brandon. Furthermore, Thein was apparently not the only dealer supplying McKone. The affidavits indicate Thein's relative "Dave" also supplied drugs to McKone. Thus, it was just as probable that "Dave" would be making the next delivery as it was that "Steve" would be.

In sum, we conclude the facts do not establish a nexus between evidence of illegal drug activity and Thein's Austin Street residence. The officers' general statements regarding the common habits of drug dealers were not alone sufficient to establish probable cause.

We, therefore, reverse Thein's conviction and remand with orders to suppress the evidence illegally gained.

GUY, C.J., and DURHAM, SMITH, MADSEN, ALEXANDER, TALMADGE, SANDERS, and IRELAND, JJ., concur.