560

[Nos. 17843-9-III; 17864-1-III. Division Three. November 28, 2000.]

THE STATE OF WASHINGTON, *Respondent*, v. RANDY DEL
McREYNOLDS, *Appellant*.
THE STATE OF WASHINGTON, *Respondent*, v. AMY JO
McREYNOLDS, *Appellant*.

*Anna K. Nordtvedt* and *David N. Gasch*, for appellants.
*John G. Wetle, Prosecuting Attorney*, and *Allen C. Nielson, Deputy*, for respondent

KATO, J. — Randy D. McReynolds appeals his convictions and sentence on multiple counts of possession of stolen property and stolen firearms and unlawful possession of firearms. His wife, Amy Jo McReynolds, appeals her convictions on multiple counts of possession of stolen property. Both appellants contend search warrants leading to their

arrests were unlawful; the trial court made several errors in conducting a CrR 3.5 hearing and in concluding Ms. McReynolds' statements to police were admissible; the court erred in failing to dismiss the prosecutions because of an officer's destruction of evidence; and the court erred in instructing the jury on the definition of knowledge. Mr. McReynolds also challenges the court's calculation of his standard sentencing range. We agree that one of the warrants was invalid and remand for additional fact-finding regarding evidence that may have been tainted by the resulting search.

These cases arose out of the issuance and execution of five search warrants in Stevens County. In a telephonic application for Warrant 1[1] on December 8, 1997, a police officer stated:

> On 12/8/97 at approximately 00:04 hours the affiant was patrolling northbound on Buena Vista Drive passed [sic] the new nursing home construction site. The affiant noticed that the wire gate was open into the site. The affiant then observed a male subject wearing dark clothing run from near one of the office trailers into the construction site. Officer Blackman was notified and responded to the location. Upon checking the area it was found that the padlocks on both wire gates had been cut off, padlocks to several storage trailers had been cut off, and the door to one office trailer had been forced open. There was a large quantity of power tools and hand tools lined up outside one of the storage trailers. There was a small air compressor and a small generator outside the office trailer. Officer Blackman and affiant observed a gray pickup drive past the site two times. When the pickup was several hundred yards away the affiant heard a voice yell and the pickup slowed or stopped on the road. Officer Blackman stopped the pickup and identified the driver as Randy McReynolds with an address of 362 Aladdin Road. The passenger was identified as Jeffery Sears. They were both then released. The owner of the Construction Company, John Steinbach, arrived at the scene. He stated that all the trailers had been padlocked or locked and all

---

[1] For clarity, the parties and the superior court labeled the documents chronologically as Warrants 1 through 5. We use the same labels.

the tools outside had been in the trailers. Ron Anderson of Anderson Construction arrived. He had the key to the remaining office trailer that appeared to not have been broken into. He unlocked the door and it was discovered that the door had been kicked in and then re-locked. Upon opening the door Officer Blackman located a subject wearing camouflage pants, a dark sweatshirt, and gloves lying on the floor under a workbench. The subject was identified as Eugene McReynolds. He is the uncle of Randy McReynolds who was driving the pickup and lived at the same address. Behind another door inside the trailer the affiant located another subject wearing dark clothing and gloves. He was identified as Leonard Wolf. Both subjects also had small flashlights with them. Both subjects were placed under arrest for burglary and attempted theft. There was an iron pry bar sitting on top of a bucket next to where the second subject was located. Ron Anderson stated that the pry bar was not in the trailer before. The pry bar had the initials E.A. inscribed on it. There was a burglary reported on 11/3/97 at Haney's construction site on North 395 in Colville where a large quantity of tools had been taken from. Many of these tools had the initials E.A. inscribed on them by the owner. Both subjects were then booked into the Stevens County Jail.

On the basis of these facts, a Stevens County District Court judge approved a warrant to search "[a] 2 story white frame dwelling and detached garage storage area" at 362 Aladdin Road in Colville. In executing the warrant, officers also searched a separate outbuilding, from which they seized several items.

Officers then applied for and obtained Warrant 2, which authorized the search of a camper, located on the property, in which Leonard Wolf lived. After executing that warrant, the officers then applied for and obtained Warrant 3, which authorized another search of the dwelling, garage, and camper.

The officers then sought and obtained warrants to search the Aladdin Road dwelling, the garage, and the camper (Warrant 4) and to search a 14-foot U-Haul truck (Warrant 5). Identical affidavits supporting the warrant applications

listed items seized and observed in the earlier searches (and identifying various items that had been reported stolen) and statements by various persons living at the residence at the time of the searches, as well as the following facts: (1) Officers had learned that Randy McReynolds had rented a storage unit, whose owner told them Randy and Amy Jo McReynolds had gone to the unit with a U-Haul truck and cleaned it out, saying they were moving to Deer Park; (2) when renting the U-Haul truck, Ms. McReynolds listed the destination as Toppenish; (3) Harold Sears, who lived at the residence, had told officers that Randy McReynolds had sold items to a man from a second-hand store approximately two weeks earlier; (4) while attempting to locate the U-Haul truck, officers interviewed Amy Jo McReynolds, who told them where the truck was located but stated that not all of the items on the truck were stolen; (5) officers searched the car driven by Amy Jo McReynolds and seized items she admitted did not belong to them, some of which had been reported stolen; (6) officers arrested Randy McReynolds near where they found the U-Haul truck, and he answered "yes" when asked if the truck contained stolen items; and (7) in another statement, Amy Jo McReynolds told officers that she and Randy McReynolds loaded various items from their pickup into the U-Haul truck.[2]

Randy McReynolds was charged with five counts of first degree burglary, four counts of second degree burglary, three counts of first degree possession of stolen property, eight counts of second degree possession of stolen property, seven counts each of possession of a stolen firearm and first degree unlawful possession of a firearm, one count of first

---

[2] The affidavit also contained the following allegations: (1) Other residents of the Aladdin Road dwelling told officers that Randy McReynolds had loaded various items into his pickup earlier that day, and he frequently would drop off items at night and leave them for 24 to 48 hours before the items disappeared; and (2) one resident told officers Randy McReynolds told him he was burglarizing and stealing from places. Randy McReynolds challenged these allegations, but the superior court declined to conduct an evidentiary hearing on this issue because it concluded the other, remaining material in the affidavits established probable cause to support the warrants.

degree theft, one count of attempted first degree theft, and one count of second degree malicious mischief. Amy Jo McReynolds was charged with three counts of first degree possession of stolen property, eight counts of second degree possession of stolen property, and five counts of possession of a stolen firearm. The superior court joined the cases for trial.

During pretrial proceedings, the court concluded the application for Warrant 1 established probable cause to issue the warrant. However, the court held that the officers unlawfully searched the outbuilding because it was beyond the scope of Warrant 1. The court thus excised from subsequent warrant applications any references to evidence seized in the unlawful search of the outbuilding. The court nevertheless concluded the officers' applications for the remaining warrants also established probable cause.

A jury found Randy McReynolds guilty of three counts of first degree possession of stolen property, six counts of second degree possession of stolen property, two counts of third degree possession of stolen property, and three counts each of possession of a stolen firearm and first degree unlawful possession of a firearm. The jury found Amy Jo McReynolds guilty of three counts of first degree possession of stolen property and six counts of second degree possession of stolen property.

■■ The primary issue here is whether the affidavit in support of Warrant 1 established probable cause to search the Aladdin Road property. The Supreme Court recently reviewed the basic law regarding review of a magistrate's decision to issue a search warrant:

> A search warrant may issue only upon a determination of probable cause. *State v. Cole*, 128 Wn.2d 262, 286, 906 P.2d 925 (1995). An application for a warrant must state the underlying facts and circumstances on which it is based in order to facilitate a detached and independent evaluation of the evidence by the issuing magistrate. *State v. Smith*, 93 Wn.2d 329, 352, 610 P.2d 869[, *cert. denied*, 449 U.S. 873] (1980); *State v. Helmka*, 86 Wn.2d 91, 92-93, 542 P.2d 115 (1975). Probable

cause exists if the affidavit in support of the warrant sets forth facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime can be found at the place to be searched. *Cole*, 128 Wn.2d at 286; *State v. Dalton*, 73 Wn. App. 132, 136, 868 P.2d 873 (1994). Accordingly, "probable cause requires a nexus between criminal activity and the item to be seized, and also a nexus between the item to be seized and the place to be searched." *State v. Goble*, 88 Wn. App. 503, 509, 945 P.2d 263 (1997) (citing Wayne R. LaFave, Search and Seizure § 3.7(d), at 372 (3d ed. 1996)).

*State v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999).

In *Thein*, the court rejected an argument that the necessary nexus is established when there is evidence a person is engaged in drug dealing and the person resides in the place to be searched. *Id.* at 146-50. The court expressly overruled *State v. O'Neil*, 74 Wn. App. 820, 879 P.2d 950 (1994), *review denied*, 125 Wn.2d 1016 (1995), *overruled by Thein*, 138 Wn.2d 133 (1999), the primary authority on which the trial court in this case relied. The *Thein* court's reasoning arguably applies as well to non-drug cases like this one.

However, the *Thein* court observed that "the existence of probable cause is to be evaluated on a case-by-case basis." *Thein*, 138 Wn.2d at 149. In a footnote, the court noted that "[u]nder specific circumstances it may be reasonable to infer such items will likely be kept where the person lives." *Id.* at 149 n.4 (citing Wayne R. LaFave, Search and Seizure § 3.7(d), at 381-85 (3d ed. 1996)). The court's reference to the LaFave treatise is helpful in light of the following passage:

> Another situation in which this problem arises is when the crime in question was a theft, burglary or robbery in which valuable property was obtained by the perpetrator. Here, the question is whether, assuming a not too long passage of time since the crime, it is proper to infer that the criminal would have the fruits of his crime in his residence, vehicle or place of business. Perhaps because stolen property is not inherently incriminating in the same way as narcotics and because it is usually not as readily concealable in other possible hiding

places as a small stash of drugs, courts have been more willing to assume that such property will be found at the residence of the thief, burglar or robber. It is commonly said that in such circumstances account may be taken of "the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property." It is most relevant, therefore, that the objects are "the sort of materials that one would expect to be hidden at [the offender's] place of residence, both because of their value and bulk," and also that the offender "had ample opportunity to make a trip home to hide" the stolen property before his apprehension.

LaFave, *supra*, § 3.7(d), at 381-84 (footnotes omitted).

This language suggests a more limited reading of the *Thein* holding, requiring that the court carefully examine the officer's affidavit to determine whether it establishes a reasonable inference that evidence of criminal activity could be found at the Aladdin Road residence.

Because the officers found Eugene McReynolds and Leonard Wolf at the scene of the burglary and Randy McReynolds and Jeffery Sears nearby, there is no likelihood the fruits of that crime would be at the property where all of the men lived. The question therefore is whether there is a basis for inferring evidence of *other* crimes would be at the Aladdin Road property. The only possible evidence is the presence at the scene of a pry bar inscribed with the initials "E.A.," which allegedly had been stolen along with a large quantity of other tools several weeks earlier.[3] But the presence of this tool, without more, does not establish an inference that evidence of the earlier burglary or any other crime would be at the Aladdin Road property. The result is that, as in *Thein*, the affidavit failed to establish a nexus between the crimes of which the residents were accused and their residence. Warrant 1 thus was issued unlawfully. The

---

[3] The transcription of the telephonic search warrant application clearly is in error. Another document, which apparently was the officer's "script" during the telephone conversation shows the initials actually were "D.A.," which matches the initials that had been engraved on tools stolen from Anderson Construction on December 3, 1997.

superior court erred in admitting the fruits of the unlawful search. *See State v. Thomas*, 91 Wn. App. 195, 201, 955 P.2d 420 ("Evidence that is the product of an unlawful search or seizure is not admissible.") (citing *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961)), *review denied*, 136 Wn.2d 1030 (1998).

But this conclusion does not end the inquiry. Evidence will not be suppressed unless the unlawful search "is at least the 'but for' cause of the discovery of the evidence." *Thomas*, 91 Wn. App. at 201 (citing *Segura v. United States*, 468 U.S. 796, 815, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984)). Not all evidence is " 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). "Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Id.* (quoting JOHN M. MAGUIRE, EVIDENCE OF GUILT 221 (1959)).

■■ In determining whether there is a nexus between the evidence at issue and the unlawful search, a court must evaluate the facts and circumstances of the particular case. *Thomas*, 91 Wn. App. at 201. In many cases, it is clear or undisputed whether evidence is fruit of an unlawful search, and the appellate court thus may decide the issue itself. However, when the record does not reveal whether the "fruit of the poisonous tree" doctrine (or one of its exceptions) applies, the matter should be returned to the trial court for resolution of the factual questions. *See State v. Warner*, 125 Wn.2d 876, 888-89, 889 P.2d 479 (1995).

Because the superior court here concluded Warrant 1 was lawful,[4] it made no findings whether subsequently obtained

---

[4] The court did hold the officers' search unlawfully exceeded the scope of the warrant and therefore excluded some evidence. But the unanswered question is what (if any) other evidence must be excluded because it is tainted by the search unlawfully authorized by Warrant 1.

evidence was tainted by the search. The case thus must be remanded for a determination of this factual question.

Despite this conclusion, we address several other issues that may arise on remand.

The first of those is whether the affidavit in support of Warrant 5 established probable cause to search the U-Haul truck. In addition to their "fruit of the poisonous tree" argument, the McReynoldses contend Warrant 5 was invalid because of the following statement:

> Det. Paramore and Capt. Webb also received information . . . that Randy McReynolds had rented a storage unit, believed to be near the Auto View Drive Inn [sic], between Colville and Kettle Falls, and further that he may be getting ready to leave the area this p.m., possibly in possession of additional stolen property.

■ The McReynoldses contend this statement failed to satisfy the *Aguilar-Spinelli* test. When an informant's tip provides the basis for probable cause to issue a search warrant, the warrant affidavit must establish both the basis of the knowledge and the credibility of the informant. *State v. Jackson*, 102 Wn.2d 432, 433, 688 P.2d 136 (1984); *see Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964). Alternatively, the substance of the tip may be corroborated by independent police investigation. *State v. Murray*, 110 Wn.2d 706, 711-12, 757 P.2d 487 (1988). If supported by this independent corroboration, the tip must be as trustworthy as a tip that itself would satisfy the *Aguilar-Spinelli* test. *Id*. at 712.

■ ■ Here, the unattributed statement quoted above satisfies neither prong of the *Aguilar-Spinelli* test. However, the very next paragraph of the affidavit demonstrates the officers independently corroborated the tip:

> Det. Paramore called the owner of the Storage Unit and asked if the McReynolds[es] had in fact rented a unit at that location. Paramore was advised that Randy McReynolds had rented a unit, and further was advised that Randy McReynolds

and his wife Amy Jo had been out to the unit on this date with a U-Haul truck and had cleaned it out, stating they were moving to Deer Park.

The source of this added information was himself an informant. As owner of the storage unit, there was a clear basis for his information. The remaining issue is whether he was credible. He was not truly anonymous, because the information in the affidavit made him readily identifiable. *See State v. Rodriguez*, 53 Wn. App. 571, 577, 769 P.2d 309 (1989). More significantly, this citizen informant provided his information in "entirely unsuspicious circumstances," a fact that supports his credibility. *See id.*

The anonymous tip thus was corroborated by independent police investigation. This additional information itself satisfied the *Aguilar-Spinelli* test. The informants' statements did not render Warrant 5 invalid.

The McReynoldses also contend the superior court erred in concluding Amy Jo McReynolds' statements to police were voluntary and admissible. After a pretrial CrR 3.5 hearing, the court entered the following findings of fact:

A. UNDISPUTED FACTS

1. Pursuant to an ongoing investigation involving charges of burglary and possession of stolen property, the Stevens County Sheriff's Office detailed officers Mike George and Jim Caruso to the area of the Sears-McReynolds home on December 10, 1997.

2. The officers were looking for a U-Haul truck that might contain stolen property and for Randy McReynolds. They arrived in the vicinity on Aladdin Road about 1800 hours. It was dark.

3. The temperature was slightly below freezing. The officers waited a few minutes and then saw two vehicles approach and park in the driveway. They drove up and parked behind the vehicles. The driver of the pickup truck was Amy McReynolds.

4. Officers Caruso and George questioned Ms. McReynolds beside her vehicle in the driveway. She had not been consuming alcohol or drugs. She was wearing light clothing, but in a few minutes Donna Sears brought her a jacket and, later, some heavy coveralls to stand on so her feet would not get cold. Ms.

McReynolds remained outside for one and one-half to two hours while the officers were present. She talked briefly to Ms. Sears. She was not permitted to leave the scene.

5. Ms. McReynolds executed a written permission to search the two vehicles (pickup truck and Oldsmobile sedan) that she and Susan McReynolds drove to the residence. . . . She was orally advised of her *Miranda* [v. *Arizona*, 348 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1996)] rights by Officer George soon after questioning began. Later she gave a written statement to the officers which was in her handwriting and executed in the driveway. . . .

6. When the officers left the Sears-McReynolds residence they returned to the Sheriff's Office. They then called Ms. McReynolds and asked her to come there to talk to them further because some aspects of her statement seemed inconsistent. She agreed to come to the office and did so. She gave a further statement.

. . . .

## C. FINDINGS AS TO DISPUTED FACTS

1. The officers did not keep Ms. McReynolds outside in the cold intentionally to overcome her will. The temperature was slightly below freezing. Ms. McReynolds was provided with a jacket and something to stand on by Ms. Sears. While it may have been inconvenient to stand outside while talking to the officers, while they searched the vehicles, and while she made a written statement, there was no misconduct by the police in having her do so.

2. The officers did not use threats or foul language to pressure Ms. McReynolds into giving a statement, either at the Aladdin residence or later at the Sheriff's office. Ms. McReynolds did ask what would happen to her children in the event she was arrested and the officers told her Child Protective Services would have to be called but that was in response to a question, not a threat. Ms. McReynolds arranged her own transportation when she came to the Sheriff's Office later and she gave further information as to how [the] U-Haul truck had been rented, how it was paid for, how and when it was loaded, etc. She was not arrested.

3. After Ms. McReynolds was orally advised of her rights she initially indicated she did not desire to talk to the officers. She did not request an attorney but she did talk to Donna Sears

when Ms. Sears came out of the house at about this time. After talking to Ms. Sears, Ms. McReynolds indicated she would be willing to talk to the officers and she did so. She then signed the consent to search form for the vehicles and advised the officers that Mr. McReynolds and the U-Haul truck were located at the restaurant in Addy, Washington. The officers did not violate Ms. McReynolds['] rights in the questioning process.

4. Ms. McReynolds was orally re-advised of her rights under *Miranda* when she arrived at the Stevens County Sheriff's Office later on the evening of December 10, 1997.

On the basis of these findings, the court concluded Ms. McReynolds' statements were voluntary and admissible.

 Admissibility of a defendant's confessions is a question of due process under the Fourteenth Amendment. *Withrow v. Williams*, 507 U.S. 680, 688, 113 S. Ct. 1745, 1751, 123 L. Ed. 2d 407 (1993). The test is whether, considering the totality of the circumstances, the confession has been " 'made freely, voluntarily and without compulsion or inducement of any sort.' " *Haynes v. Washington*, 373 U.S. 503, 513, 83 S. Ct. 1336, 10 L. Ed. 2d 513 (1963) (quoting *Wilson v. United States*, 162 U.S. 613, 623, 16 S. Ct. 895, 40 L. Ed. 1090 (1896)).

 A trial court's determination on the "ultimate issue of 'voluntariness' " is a legal determination, subject to independent, de novo review. *Miller v. Fenton*, 474 U.S. 104, 110, 106 S. Ct. 445, 88 L. Ed. 2d 405 (1985); *Derrick v. Peterson*, 924 F.2d 813, 817 (9th Cir. 1990), *cert. denied*, 502 U.S. 853 (1991). However, when there is "substantial evidence from which the trial court could find by a preponderance of evidence that a confession was given voluntarily, the trial court's determination of voluntariness will not be disturbed on appeal." *State v. Ng*, 110 Wn.2d 32, 37, 750 P.2d 632 (1988).

 The McReynoldses rely on evidence presented on their behalf during the CrR 3.5 hearing suggesting the officers were aggressive, threatening, and abusive during the interview at the Aladdin Road residence. However, the court's findings directly or implicitly rejected this evidence

and accepted the officers' accounts of the incident. Substantial evidence supports the court's findings. *See State v. Hill*, 123 Wn.2d 641, 644-47, 870 P.2d 313 (1994) (trial court's factual determinations after a suppression hearing will be overturned only if they are not supported by substantial evidence).

More specifically, the McReynoldses contend the officers violated Amy Jo McReynolds' *Miranda*[5] rights by continuing the interrogation after she asserted her right to remain silent.[6] Police interrogation must stop when a person asserts her *Miranda* rights unless the person "initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). A person may be found to have waived the right if she "freely and selectively responds to police questioning after initially asserting *Miranda* rights." *State v. Wheeler*, 108 Wn.2d 230, 238, 737 P.2d 1005 (1987) (citing *State v. Coles*, 28 Wn. App. 563, 567, 625 P.2d 713, *review denied*, 95 Wn.2d 1024 (1981)). Here, the court found that Amy Jo McReynolds initially asserted her right to remain silent but later changed her mind after consulting with Donna Sears. This finding is supported by the testimony of both officers to the effect that Amy Jo McReynolds agreed to talk to the officers after speaking privately with Ms. Sears.

The court's findings, which are supported by substantial evidence, justify the conclusion that Amy Jo McReynolds validly waived her *Miranda* rights after speaking with Ms. Sears. The court did not err in concluding the statements were admissible.[7]

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[6] The McReynoldses contend Amy Jo McReynolds also requested an attorney, but the court found she did not. This finding is supported by Detective Caruso's testimony.

[7] The McReynoldses also have assigned error to the trial court's refusal to allow Amy Jo McReynolds' attorney "to call further witnesses during the 3.5 hearing to testify that while Officer George was on the witness stand, Officer Caruso was signaling to Officer George how to testify." Randy McReynolds did testify to this

The McReynoldses next contend the court erred in failing to dismiss the prosecutions because of an officer's destruction of evidence. Before trial, the McReynoldses moved for dismissal based on destruction of exculpatory evidence. In support of the motion, they submitted an affidavit of Joshua Shay, who lived with his wife at the Aladdin Road residence. In the affidavit, Mr. Shay stated he and his wife each wrote a statement for the police on December 10, 1997, which made no incriminating statements about Randy McReynolds. The affidavit stated deputies then confronted the Shays and demanded that they write a different statement incriminating Randy McReynolds. The affidavit stated Detective Benjamin Paramore then destroyed the original statements.[8]

The trial court denied the motion to dismiss on this ground, noting Mr. Shay could testify to what his original statement said.

■■■ The Supreme Court recently outlined the law regarding destruction of evidence:

> To comport with due process, the prosecution has a duty to disclose material exculpatory evidence to the defense and a related duty to preserve such evidence for use by the defense. *See Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963); *California v. Trombetta,* [467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)].

> Two Supreme Court cases, *California v. Trombetta, supra,* and *Arizona v. Youngblood,* 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), developed a test to determine whether the government's failure to preserve evidence significant to the defense violates a defendant's due process rights. It is clear that if the State has failed to preserve "material exculpatory

incident, but the court declined to hear testimony from his attorney. A court may exclude evidence on "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403. A trial court's determination is reviewed for manifest abuse of discretion. *Erickson v. Robert F. Kerr, M.D. P.S., Inc.,* 125 Wn.2d 183, 191, 883 P.2d 313 (1994). The additional testimony requested here would have been merely corroborative, and there has been no showing of abuse of discretion.

[8] Detective Paramore admitted at trial that he destroyed the Shays' original statements and asked them write new ones.

evidence" criminal charges must be dismissed. Recognizing that the right to due process is limited, however, the Court has been unwilling to "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58. A showing that the evidence might have exonerated the defendant is not enough. In order to be considered "material exculpatory evidence", the evidence must both possess an exculpatory value that was apparent before it was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *Trombetta*, 467 U.S. at 489.

*State v. Wittenbarger*, 124 Wn.2d 467, 475, 880 P.2d 517 (1994).

It is unclear here whether the Shays' original statements were truly exculpatory. Mr. Shay's affidavit described its contents as follows: "I never said anything about Randy McReynolds or Eugene McReynolds having told me they were stealing and burglarizing places. My first statement pertained only to Leonard Wolf." At best, it appears the statement was neutral about Randy McReynolds' involvement. The exculpatory value of the statements were not apparent at the time they were destroyed.

Even if they were exculpatory, moreover, the McReynoldses clearly could have obtained comparable evidence by calling the Shays as witnesses at trial. In fact, the Shays did not testify at trial, but there is no showing they were unavailable. The McReynoldses have failed to show they were unable to obtain this comparable evidence.

The statements thus fail one or both of the requirements to be considered "material exculpatory evidence." The court did not err in denying the motion to dismiss.

Next, the McReynoldses contend the court erred in failing to dismiss the prosecutions because of the conduct of law enforcement officials. Also before trial, Amy Jo McReynolds moved for dismissal pursuant to CrR 8.3(b), alleging police officers had engaged in misconduct. A memorandum sup-

porting the motion alleged the following instances of misconduct:

1. Para-military type raid in pre-dawn hours upon a residence in winter, for a property crime where no exigency existed;

2. Coarse, frightening police conduct subjecting innocent people and children to embarrassment and fear[;]

3. Illegal search beyond scope of warrant;

4. Misrepresentation in application for Warrant [2];

5. Coercive and inhumane tactics by police to extract statement from [Amy Jo McReynolds] making her stand outside in freezing conditions for two or more hours[.][9]

The court also denied this motion.

■■ ■ CrR 8.3(b) provides in part:

The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect[s] the accused's right to a fair trial.

A court's decision under this rule is reviewed for abuse of discretion. *State v. Michielli*, 132 Wn.2d 229, 240, 937 P.2d 587 (1997). To support dismissal, a defendant must show arbitrary action or governmental misconduct. *Id.* at 239. Dismissal is not justified when suppression of evidence will eliminate whatever prejudice is caused by the action or misconduct. *City of Seattle v. Orwick*, 113 Wn.2d 823, 831, 784 P.2d 161 (1989).

■■ The first two grounds asserted here apparently relate to police conduct during execution of one or more of the warrants. Assuming there is a factual basis for the allegations, the McReynoldses have failed to explain specifically how the officers' behavior was misconduct. Their argument appears to be that the conduct was unnecessary, but this does not establish misconduct.

---

[9] The document listed three additional grounds, but the McReynoldses' briefs have not listed them. They thus apparently have abandoned those grounds on appeal.

The third ground relates to the legality of the warrants, which we already have discussed.

The fourth ground refers to a misrepresentation in the application for Warrant 2. It is unclear as to what statement the McReynoldses refer. However, even if there were a misrepresentation, the appropriate remedy would be suppression of evidence, not dismissal.

Finally, the fifth ground refers to police conduct while questioning Amy Jo McReynolds outside the Aladdin Road residence. In its findings after the CrR 3.5 hearing, the court directly or implicitly rejected many of these allegations. Even if the allegations were true, the remedy would be to suppress the coerced statement, not to dismiss the prosecution.

The court did not abuse its discretion in denying the motion to dismiss because of officers' conduct.

The McReynoldses next contend the trial court abused its discretion in failing to instruct the jury on the definition of the word "knowledge." The court instructed the jury as follows:

> A person knows or acts knowingly or with knowledge when he is aware of a fact, facts or circumstances or result which is described by law as being a crime, whether or not the person is aware that the fact, circumstance or result is a crime.
>
> If a person has information which would lead a reasonable person in the same situation to believe that facts exist which are described by law as being a crime, the jury is permitted but not required to find that he acted with knowledge.
>
> Acting knowingly or with knowledge also is established if a person acts intentionally.

*See* 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.02, at 150 (2d ed. 1994).

The court rejected an instruction proposed by Amy Jo McReynolds that would have added the following sentence: "The term 'willful' is synonymous with the term 'knowledge'."

 A trial court has considerable discretion in de-

termining the number and wording of instructions. *State v. Dana*, 73 Wn.2d 533, 536, 439 P.2d 403 (1968). While a defendant has a right to have jurors fully instructed on the law, there is no right to an instruction that misstates the law. *State v. Staley*, 123 Wn.2d 794, 803, 872 P.2d 502 (1994). Jury instructions are proper if they are not misleading, are a correct statement of the law, and allow the defendant to argue his or her theory of the case. *State v. Ng*, 110 Wn.2d 32, 41, 750 P.2d 632 (1988); *State v. Hansen*, 46 Wn. App. 292, 730 P.2d 706, 737 P.2d 670 (1986).

 The trial court's instruction here, which is based on the pattern instruction, is a correct statement of the law. *State v. Leech*, 114 Wn.2d 700, 710, 790 P.2d 160 (1990); *see State v. Johnson*, 119 Wn.2d 167, 174, 829 P.2d 1082 (1992). The McReynoldses contend their proposed additional language is supported by RCW 9A.08.010(4), which provides:

> Requirement of Wilfulness Satisfied by Acting Knowingly. A requirement that an offense be committed wilfully is satisfied if a person acts knowingly with respect to the material elements of the offense, unless a purpose to impose further requirements plainly appears.

Arguably, this language would be appropriate if any of the court's "to convict" instructions had used a form of the word "willful" (or "wilful"). But none of the court's other instructions used those terms, so there was no need for the reference. Indeed, doing so merely would have confused the jury. Moreover, the instruction permitted the McReynoldses to argue their theory of the case, which was that they did not know the property was stolen.

The court's instruction correctly stated the law, was not misleading, and permitted the McReynoldses to argue their theory of the case. The court did not abuse its discretion by rejecting their proposed instruction.

 Finally, Randy McReynolds contends the court erred in calculating his standard range of 477 to 636 months. The issue here is whether the sentences for the six firearms convictions should run concurrently or consecu-

tively. RCW 9.41.040(6), enacted as part of the "Hard Time for Armed Crime" initiative in 1995, provides in pertinent part:

> Notwithstanding any other law, if the offender is convicted under this section for unlawful possession of a firearm in the first or second degree and for the felony crimes of theft of a firearm or possession of a stolen firearm, or both, then the offender shall serve consecutive sentences for each of the felony crimes of conviction listed in this subsection.

RCW 9.41.040(6); *see* LAWS OF 1995, ch. 129, § 16 (Initiative Measure 159).

However, this provision does not preclude a finding that the convictions are the same criminal conduct for purposes of determining the offender score pursuant to RCW 9.94A.400(1)(a). *State v. Murphy*, 98 Wn. App. 42, 51, 988 P.2d 1018 (1999), *review denied*, 140 Wn.2d 1018 (2000); *State v. Simonson*, 91 Wn. App. 874, 885, 960 P.2d 955 (1998), *review denied*, 137 Wn.2d 1016 (1999); *State v. Roose*, 90 Wn. App. 513, 517, 957 P.2d 232 (1998). In its discretion, a court may find that two or more convictions encompassed the same criminal conduct if they (1) involved that same criminal intent, viewed objectively, (2) were committed at the same time and place, and (3) involved the same victim. RCW 9.94A.400(1)(a); *State v. Vike*, 125 Wn.2d 407, 410, 885 P.2d 824 (1994); *State v. Maxfield*, 125 Wn.2d 378, 886 P.2d 123 (1994). Unlawful possession of multiple firearms may be the same criminal conduct because they all involve the same victim—the public at large. *Simonson*, 91 Wn. App. at 885. If Mr. McReynolds is convicted on remand, the sentencing court may consider these authorities.

We reverse the court's decision that Warrant 1 was lawful and remand for determination of what subsequently obtained evidence was tainted by the resulting unlawful search.

KURTZ, C.J., and SWEENEY, J., concur.

Reconsideration granted in part and opinion modified January 30, 2001.

Review denied at 144 Wn.2d 1003 (2001).