[No. 54277–5.   En Banc.   June 9, 1988.]

THE STATE OF WASHINGTON, *Respondent,* v. JOHN JAMES MURRAY, *Petitioner.*

*John L. Farra,* for petitioner.

*Michael G. Spencer, Prosecuting Attorney,* and *William P. Gilbert* and *Harold S. Menefee, Deputies,* for respondent.

*Dennis Benjamin* on behalf of the Washington Appellate Defender Association, amicus curiae for petitioner.

*Seth R. Dawson, Prosecuting Attorney for Snohomish County,* and *Seth Aaron Fine, Deputy,* amici curiae for respondent.

DURHAM, J.—In July 1984, Grays Harbor County police discovered over 100 marijuana plants as well as lights, soil, fertilizer and other marijuana growing paraphernalia in the basement of a house in Montesano, Washington, apparently belonging to defendant John Murray's grandmother. On

the strength of this evidence, the Grays Harbor prosecutor filed an information charging Murray with manufacturing marijuana and possessing it with intent to deliver, in violation of the Uniform Controlled Substances Act, RCW 69.50.401. The prosecutor asserted these same charges in a petition to revoke Murray's probation for a 1983 marijuana offense.

At issue here is the validity of the warrant pursuant to which police searched the Montesano residence. On Murray's motion, Judge John H. Kirkwood, presiding in the criminal case, ruled the search warrant invalid and ordered the evidence obtained from the search suppressed. While the State's appeal of that order was pending in the Court of Appeals, Judge Robert L. Charette denied Murray's motion to suppress in the probation revocation proceeding. Murray's appeal of Judge Charette's ruling was consolidated with the State's appeal in the criminal case.

The Court of Appeals affirmed both rulings in an unpublished opinion. *State v. Murray,* noted at 48 Wn. App. 1070 (1987). The court agreed with Judge Kirkwood that the search warrant was not supported by probable cause and upheld his suppression order in the criminal case. Notwithstanding that it believed the warrant to be invalid, however, the court held that the evidence obtained from the search would be admissible in the probation revocation proceeding. Both parties petitioned for review.

I

The Court of Appeals opinion touches on a matter of substantial import to the law of search and seizure in this state. This is the extent to which the exclusionary rule of Const. art. 1, § 7 exists and functions independently of the remedy of exclusion courts apply when the government violates citizens' rights under the fourth amendment to the United States Constitution. In the context presented here, cases from the Court of Appeals are divided over this question. Following federal precedents, the courts in *State v. Kuhn,* 7 Wn. App. 190, 499 P.2d 49, *aff'd on other grounds,*

81 Wn.2d 648, 503 P.2d 1061 (1972), *State v. Simms,* 10 Wn. App. 75, 79–80, 516 P.2d 1088 (1973) (dicta), *review denied,* 83 Wn.2d 1007 (1974), and *State v. Proctor,* 16 Wn. App. 865, 867, 559 P.2d 1363, *review denied,* 89 Wn.2d 1007 (1977), held or stated in dicta that the exclusionary rule should not apply in probation revocation proceedings. In *State v. Lampman,* 45 Wn. App. 228, 232, 724 P.2d 1092 (1986), however, the court declared that "article 1, section 7 requires application of the exclusionary rule, without exception, to probation revocation proceedings."

This division reflects a broad interpretive uncertainty that exists about the nature of the article 1, section 7 exclusionary rule. Some dicta have issued from this court in favor of an absolute rule of exclusion when evidence is obtained in a manner violative of article 1, section 7 rights. *State v. White,* 97 Wn.2d 92, 111, 640 P.2d 1061 (1982); *State v. Bonds,* 98 Wn.2d 1, 11, 653 P.2d 1024 (1982), *cert. denied,* 464 U.S. 831 (1983). Yet we have never firmly relied on these dicta as a basis for a suppression order. Moreover, we have not had occasion to test these dicta against recently articulated principles of constitutional analysis, according to which our interpretations of state constitutional provisions are to be guided by well reasoned federal law precedents. *See State v. Gunwall,* 106 Wn.2d 54, 60–61, 720 P.2d 808 (1986); *State v. Berber,* 48 Wn. App. 583, 740 P.2d 863, *review denied,* 109 Wn.2d 1014 (1987).

We granted review in this case to address these issues and to resolve some of the uncertainties which attend them. As it turns out, however, the resolution of this case does not require any consideration of the exclusionary rule, state or federal. We find that the search warrant was valid and, thus, that the search of the Montesano house did not violate Murray's constitutional rights.

## II

When adjudging the validity of a search warrant, we consider *only* the information that was brought to the attention of the issuing judge or magistrate at the time the

warrant was requested. *See, e.g., Whitley v. Warden,* 401 U.S. 560, 565 n.8, 28 L. Ed. 2d 306, 91 S. Ct. 1031 (1971); *Spinelli v. United States,* 393 U.S. 410, 413 n.3, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969). From the record, it appears that this includes only those facts stated in the "Affidavit for Search Warrant" submitted by Detective Bill Stocks, a Grays Harbor County drug enforcement officer.

According to his affidavit, Detective Stocks heard from an informant, who had heard from a friend (hereinafter referred to as "tipster"), about Murray's involvement in marijuana growing. The tipster reported seeing large marijuana plants in the basement of the Montesano house, being cultivated under artificial "grow lights". The tipster said also that Murray told him the grow operation produced a monthly cash crop of marijuana.

The affidavit attests to the informant's credibility, but contains no information about the credibility of the tipster. It does, however, describe evidence corroborating the tipster's information that Detective Stocks obtained through his own investigation. First, electricity consumption data for the Montesano house obtained from the Public Utility Department showed an average monthly use over the previous 4 to 6 months of 5,000 to 6,000 kilowatt hours, which, Detective Stocks learned, was about double the average monthly consumption rate for a house of similar age and square footage occupied by a single elderly person. High electricity consumption is common to marijuana grow operations, the affidavit states, "to power the lighting and ventilation necessary to conduct proper cultivation."

Second, Detective Stocks heard "what sounds like an electric exhaust fan" operating in the basement at 11 p.m. He saw no steam escaping from the basement, however. According to the affidavit, "[t]his is inconsistent with the normal use of a bathroom or exhaust fan while bathing or showering."

Third, by means of an infrared viewing device, Detective Stocks observed that

[u]like the typical residence, the concentration of heat in this residence is located in the basement area. The concentration of heat is extreme . . . I also observed extraordinary amounts of heat escaping from the vicinity of what I believed to be the bathroom exhaust fan. . . . [T]he high heat generated by these lights in growing marijuana is consistent with the heat I observed within this residence.

Detective Stocks indicated also that because he observed no visible lighting in the basement, he believed that the basement windows had been sealed to hide the goings–on within.

Finally, Detective Stocks confirmed the accuracy of the description of the Montesano house provided by the tipster and learned from other officers that Murray had been observed at the residence.

### III

The validity of a search warrant depends on the existence of "probable cause". As we have interpreted Const. art. 1, § 7, that provision forbids police searches of private homes except when probable cause exists and a warrant has issued. *See, e.g., State v. Huft,* 106 Wn.2d 206, 209, 720 P.2d 838 (1986). When police suspicions of illegal activity originate in an informant's tip, probable cause is tested against the standards described in *Spinelli v. United States,* 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969) and *Aguilar v. Texas,* 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964). The "*Aguilar–Spinelli* test" holds that probable cause will exist only if the informant's basis of knowledge and veracity have been demonstrated or if the substance of the tip has been verified by independent investigation. *Huft,* at 209–10; *State v. Jackson,* 102 Wn.2d 432, 436–38, 688 P.2d 136 (1984).

Here, the basis of knowledge prong is readily satisfied by the tipster's claim that he personally observed marijuana growing in the basement of the Montesano house. The affidavit for search warrant says nothing about the tipster's veracity, however. Thus, probable cause cannot be said to

exist unless the deficiency in the veracity prong of *Aguilar–Spinelli* is compensated for by the corroborating evidence obtained through independent police investigation.

■ Corroborating evidence offered to remedy a deficiency in either prong of the *Aguilar–Spinelli* test "should point to suspicious activities or indications of criminal activity along the lines suggested by the informant." *Huft,* at 210. "Merely verifying 'innocuous details', commonly known facts or easily predictable events should not suffice to remedy a deficiency in either the basis of knowledge or veracity prong." *Jackson,* at 438. Probable cause exists, moreover, only if the tip, as corroborated, "is as trustworthy as a tip which would pass [the *Aguilar–Spinelli* test] without independent corroboration". *Spinelli,* at 415; *see Jackson,* at 446.

Applying these principles to the facts stated above, we conclude that the independently discovered information described in Detective Stocks' affidavit sufficiently corroborates the substance of the tipster's claims to establish the veracity of those claims. The accuracy of the tipster's description of the Montesano house and the evidence of increased electricity consumption, standing alone, perhaps would not be sufficient to establish the tipster's veracity, as these are "innocuous facts". *See State v. Huft, supra* at 211. But when this evidence is combined with the unusual electric fan usage, the extreme levels of heat observed in the residence's basement, and the basement's notable darkness, it provides "the judicial officer [issuing the warrant] good cause, that is, rational grounds to believe that criminal activity or evidence in proof of it existed at the premises to be searched, [and] the warrant on review should be held reasonably issued." *State v. Patterson,* 83 Wn.2d 49, 61, 515 P.2d 496 (1973).

This is not to say that whenever a fan can be heard in a dark, hot, energy–inefficient basement, a search warrant will issue. If *both* prongs of the *Aguilar–Spinelli* test are not satisfied, something more may be necessary to establish

the probability that criminal activity is afoot. *See, e.g., State v. Huft, supra; State v. White,* 44 Wn. App. 215, 720 P.2d 873 (1986), *review denied,* 107 Wn.2d 1020 (1987); *State v. McPherson,* 40 Wn. App. 298, 698 P.2d 563 (1985). For example, in *State v. Sterling,* 43 Wn. App. 846, 719 P.2d 1357, *review denied,* 106 Wn.2d 1017 (1986), police were able to overcome deficiencies in both prongs of the *Aguilar–Spinelli* test with evidence similar to that presented in this case, plus the significant fact that the suspected grower had prior narcotics convictions.

Here, the tipster asserted from personal knowledge that marijuana was being grown in the Montesano residence and the unusual circumstances discovered by police gave substance to that allegation. Accordingly, the affidavit for search warrant provided a "substantial basis" for the issuing judge's finding that, more likely than not, evidence of criminal activity would be found. *See State v. Patterson, supra* at 55. To the extent any doubts persist, "the deference due the issuing [judge] tips the balance in favor of upholding the warrant." *State v. Jackson, supra* at 446.

## IV

Murray's attack on the validity of the warrant includes allegations that some of the evidence adduced to establish probable cause was obtained illegally. First, he alleges that "officers clearly violated state law by obtaining information through the public utility in regard to the consumption of electricity at the dwelling of the Respondent." Second, he asserts that Detective Stocks violated his right to privacy by "going on the private real property of the Respondent and going up to the house and actually putting a scientific device to the house to determine heat consumption and loss".

If we were able to determine, from the record and the arguments presented, that Murray's rights were violated as he contends they were, then the heat and electricity information asserted in the affidavit of search warrant could be excluded from our assessment of the warrant's

validity. *See State v. Gunwall,* 106 Wn.2d 54, 70, 720 P.2d 808 (1986); *State v. Moore,* 29 Wn. App. 354, 362, 628 P.2d 522, *review denied,* 96 Wn.2d 1003 (1981); 4 W. LaFave, *Search and Seizure* § 11.4(f) (2d ed. 1987). However, Murray has not met his burden—factually or legally—of proving that this evidence was obtained unlawfully. *State v. Smith,* 50 Wn.2d 408, 412, 312 P.2d 652, 314 P.2d 1024 (1957); *see generally* 4 W. LaFave § 11.2(b).

First, the record nowhere sets forth facts that would enable us to assess Murray's privacy interests, under the state or federal constitution, in the searched premises. We are reasonably certain the house did not belong to Murray, but beyond that we do not know who owned the house,[1] who lived there, and what Murray's expectation of privacy was with respect to the house, the electricity and the heat.[2] Thus, the record is inadequate to give Murray standing to challenge the electricity and heat consumption evidence. *See generally* 4 W. LaFave § 11.3 (exploring standing issues).

Even assuming Murray has standing, his legal arguments are inadequate to provide the basis for meaningful review of the issues he raises. The quotation above sets forth the entirety of Murray's appellate argument on the legality of the police's receipt of the electricity consumption data. No governing case authority or legal principle has been cited, though at least two recent cases may be relevant. *See State v. Gunwall, supra* at 63–70 (article 1, section 7 protects residential phone records); *In re Rosier,* 105 Wn.2d 606, 717 P.2d 1353 (1986) (public disclosure law protects electricity

---

[1] At a suppression hearing held by Judge Kirkwood, Murray's counsel stipulated that the house belonged to Murray's grandmother, and that the electric bill was in her name. During oral argument before this court, however, he stated that the house belonged to Murray's mother.

[2] For an instructive discussion of the role of privacy expectations in state and federal constitutional analysis, see *State v. Berber,* 48 Wn. App. 583, 586–88, 740 P.2d 863, *review denied,* 109 Wn.2d 1014 (1987).

consumption data).[3] In the trial court, the argument was not advanced beyond a vague reference to the state public disclosure law and Const. art. 1, § 7. Bald allegations of this sort do not merit consideration. *See Rosier,* at 616.

The argument proffered on the claim that use of the infrared viewer was unconstitutional is similarly wanting for substance and, indeed, somewhat misconceived. Murray's allegation appears to be that police trespassed on his property when they put "the infrared reflector on the house to detect heat and heat capacity." No showing has been made that an actual physical trespass occurred, however. Thus, as presented to us, the challenge to the heat evidence is without merit.

The flaw in this argument is not only in its failed proof, but also in its unnecessarily confined premise. It is clearly established that constitutional privacy protections extend to "people, not places." *Katz v. United States,* 389 U.S. 347, 351, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967); *see also State v. Myrick,* 102 Wn.2d 506, 513, 688 P.2d 151 (1984) (Const. art. 1, § 7 protects "private affairs", not "protected places"). Thus, Murray need not have rested his challenge on the occurrence of a physical trespass.

## V

The evidence Murray seeks to have suppressed was obtained pursuant to a valid search warrant.[4] Thus, Murray's asserted ground for suppression is meritless and his

---

[3]We recognize that when Murray briefed this issue for the Court of Appeals, *Gunwall* and *Rosier* had not yet been decided. Murray could have developed his argument in light of these cases in an answer to the State's petition for review, however.

[4]Murray has not put in issue the validity of the warrant under the fourth amendment to the United States Constitution, and thus we decline to address that question. We note, however, that because the requirements for probable cause are stricter under Const. art. 1, § 7 than under the Fourth Amendment, if a warrant is valid under the state law, it most likely will not be invalid under the analogous federal principles. *Cf. State v. Jackson,* 102 Wn.2d 432, 446, 688 P.2d 136 (1984) (Dimmick, J., concurring in the result) (suggesting that analysis under the "totality of the circumstances" approach of *Illinois v. Gates,* 462 U.S. 213, 76

motions to suppress should be denied. The Court of Appeals decision in cause 8170–9–II is reversed, and the decision in cause 8515–1–II is affirmed.

PEARSON, C.J., UTTER, DOLLIVER, DORE, ANDERSEN, CALLOW, and GOODLOE, JJ., and NOE, J. Pro Tem., concur.

L. Ed. 2d 527, 103 S. Ct. 2317 (1983), is unnecessary if "the stricter requirements of the *Aguilar–Spinelli* test" are satisfied).