
FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 JUL 23 AM 8: 37

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 76075-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JONES, SHAQUILLE CAPONE, | ) | |
| DOB: 02/25/1994, | ) | |
| | ) | |
| Appellant. | ) | FILED: July 23, 2018 |

SCHINDLER, J. — A jury convicted Shaquille Capone Jones of three counts of first degree assault with a firearm, unlawful possession of a firearm in the second degree, possession of a stolen firearm, and tampering with a witness. Jones seeks reversal, arguing the court erred by denying his motion to suppress two photomontages and the evidence seized after executing a search warrant for a rental car. Jones also challenges imposition of the $200 criminal filing fee. We affirm.

## FACTS

On June 29, 2015, Kwamain Fahie picked up his friend Dominique Colon-Reyes in a gold Cadillac Deville. Fahie and Colon-Reyes decided to buy Xanax. Colon-Reyes called Shaquille Capone Jones and arranged to meet him in Everett to buy Xanax.

Larry Dawson and Christopher Hisel worked at the Taco Bell on Evergreen Way and 75th Street SE in Everett. After Dawson finished his shift at around 6:00 p.m., he sat on his bike outside the Taco Bell, smoked cigarettes, and talked with Hisel and his friends. Dawson's bike is a purple or pink Mongoose. It was a warm and sunny summer night and still light out.

Hisel's friend Clyde Cieslik was at the Taco Bell. Hisel talked with Cieslik briefly but Cieslik was "on the phone." Cieslik and his friend Thanh Lam wanted to purchase Xanax. At some point, Cieslik either made or received a phone call.

Fahie and Colon-Reyes met Jones at around 6:00 p.m. at a convenience store on Evergreen Way. Jones was driving a light-colored SUV.[1] Three other people—two men and a woman—were in the SUV. Fahie and Colon-Reyes pulled up near the SUV and talked to Jones. They planned to find a place to park Fahie's car and spend the rest of the day with Jones.

After meeting with Fahie and Colon-Reyes, Jones drove approximately five blocks away to the Taco Bell at Evergreen Way and 75th Street SE. Jones parked the SUV in the middle of the Taco Bell parking lot. Fahie and Colon-Reyes followed Jones to the Taco Bell. Fahie backed the Cadillac into a parking stall.

Cieslik walked to the SUV and spoke with Jones about purchasing Xanax. As Cieslik walked away from the SUV, Jones yelled at Dawson. Hisel heard Jones yelling that Dawson "needed to stop looking at him, because he's a faggot on a pink bike and he is going to beat his ass." Dawson "felt really threatened." Dawson said his "heart got a little pumped up." Hisel said Dawson "started freaking out, took his shirt off, [and]

---

[1] Sport-utility vehicle.

2

told the dude to get out of the car." Dawson began cursing at Jones and "flexing his muscles." Jones yelled at Dawson.

Fahie saw two white males, later identified as Dawson and Hisel, standing by the sidewalk near the Taco Bell entrance talking to the people in the SUV. Fahie and Colon-Reyes got out of the Cadillac and walked toward the SUV. While walking toward the SUV, Fahie heard one of the white males say, "[D]on't be a pussy and pull your gun out." Jones got out of the SUV and pulled a gun "out of his crotch area." Hisel heard Jones say he "was going to kill em." Jones began firing "right away." When Fahie heard the gunshots, he started "back peddling" toward his car. Fahie saw Jones shooting toward the Taco Bell in the direction of the two white males.

Dawson "yelled gun" and immediately began running. Dawson ran inside the back door of the Taco Bell. Once Dawson was inside the Taco Bell, he realized he had been shot. He felt "[w]arm blood rushing down," filling his sock. Dawson had been shot in his lower back/upper buttocks area and in his right ankle, near his Achilles tendon.

Hisel did not have time to run, "[i]t all happened so quick that I didn't think about running." Jones shot Hisel in the right femur. Hisel "stood there for a second" before he "realized there was a hole in [his] pants." When Hisel turned to run away, his "leg collapsed out from under [him]." Hisel "could hear people yelling" but his "ears were just ringing." While lying on the ground, Hisel saw another man, later identified as Colon-Reyes, who appeared to have been shot "[b]ecause he started holding his abdomen and walking towards the [SUV]." Hisel saw Jones "reload[ ] the clip" and point the gun at him. But when Jones realized he had shot his friend, he left in the SUV.

Fahie saw Colon-Reyes "limping" toward the Cadillac. Blood was running down his leg. Colon-Reyes told Fahie, " 'BG shot me on accident, he shot me.' "[2] Fahie pulled Colon-Reyes into the Cadillac and rushed him to Providence Hospital in Everett.

Dawson checked to make sure Hisel was "alive." Hisel was lying on the ground, holding his lower thigh, and "crying out." Medics arrived and transported Dawson and Hisel to the hospital. Officers seized a number of .45 caliber shell casings from the parking lot.

When Fahie arrived at the hospital, he dropped off Colon-Reyes at the emergency entrance and then parked his car in the parking garage. Providence contacted the police about the gunshot victim. Several Everett Police Department officers responded. Officer Andrew Mclauchlan looked through the windows of the Cadillac and saw "[o]n the front passenger's seat there was a large amount of blood that was still wet indicating that it was fresh." Officer Mclauchlan took a photograph of Fahie standing near the Cadillac, speaking to another officer.

While Fahie was talking to the officers, he received a phone call from Jones. Fahie answered and left the phone on while he spoke to the officers. Fahie "made up a story saying that it was a whole different group" who committed the shooting.

Officer Mclauchlan went to talk to Hisel. While Officer Mclauchlan was asking him questions, Hisel was "crying out" and "in excruciating pain." Hisel asked for additional pain medication and medical staff gave it to him. Officer Mclauchlan showed Hisel the photo he took of Fahie. Hisel responded, "[T]hat's him, that's the guy who shot me." Shortly after Hisel made this statement, "his eyelids became droopy, he slurred his speech," and he fell unconscious.

---

[2] Jones has a known alias of "BG" or "Bread Getter."

Officer Inci Yarkut arrested Fahie and took him to the Everett Police Department north precinct. Detective Maiya Atkins interviewed Fahie at the precinct. Fahie was reluctant to agree to an interview because he was "worried about being labeled a snitch." But Fahie answered questions, showed Detective Atkins the social media accounts of the people involved, and gave the detective phone numbers. Detective Atkins released Fahie.

After the interview with Fahie, the police investigation focused on Jones. Detective Atkins gathered information from different databases and social media sites. Department of Licensing records showed a 2006 silver Chevrolet Blazer registered to Jones.

Criminal specialist Debra Richardson found a recent photograph of Jones using his date of birth and name and prepared a photomontage using the "basic characteristics that the machine is allowed to let me in[sert], sex, race, height, weight, hair color, facial hair," to obtain other similar photographs. Richardson then sorted through the photos and compared them to Jones' photo. Richardson selected five photos of men who looked similar to Jones. Richardson placed all six photos on a single page. Jones is depicted in the photomontage as number 4.

The next day on June 30, Detective Atkins and Detective Brad Williams visited Dawson at his home to show him the photomontage. Detective Atkins gave Dawson a standard instruction form and read it to him. The instruction form states:

> **BEFORE VIEWING THE PHOTOMONTAGE, WE WANT YOU TO BE AWARE OF THE FOLLOWING. <u>PLEASE READ CAREFULLY.</u>**
>
> 1. The person(s) sought in the incident in which you are a witness may not be in the photomontage.

2. Persons photographed may have changed their hairstyle, glasses styles, or manner of dress since the photograph was taken.

3. The person whom you indicate as the person you saw involved in the incident is the person whom you should pick.

4. The officer who shows you the photomontage cannot indicate to you whether or not you have picked the right or wrong person.

5. The officer may require a written statement from you as to your observations. This does not reflect the accuracy of your choice of photo.

6. The officer's failure to comment on your choice should not reflect as a lack of care on his/her part. General investigate [sic] principles in striving to show complete objectivity in the course of the investigation into your incident, merit that the above procedure is performed.

The form also gives specific instructions for viewing the photomontage:

**INSTRUCTIONS:**

1. When the officer places the photomontage in front of you, please view each photo carefully and take as long as you like. Feel free to comment on your observations. However, understand that the officer may not reply to your comments.

2. After you have viewed the photomontage and you feel that a person involved in your incident is portrayed, indicate that choice to the officer and write the number of the photo in the blank provided below and sign the affirmation.

After asking whether Dawson had any questions and confirming he understood the instructions, Detective Atkins showed Dawson the six-person photomontage. Dawson said the shooter "had been wearing a hat" and "went kind of back and forth between the individuals that are pictured in photograph number 2 and number 4." But Dawson concluded, "[W]ell, he doesn't look like the person in number 2, he does look like the person in number 4." Dawson said the "furrowed brows" of the person in number 4 looked like the shooter, noting, "[T]hat was the look that the shooter had given

6

right before he shot." Because Dawson did not seem completely sure of his selection, Detective Atkins asked him to complete a witness statement rather than sign a photomontage number on the form. In his witness statement, Dawson states, "I think it's 4 cuz of his face and eyes."

The Everett Police Department Anti-Crime Team investigated several addresses associated with Jones. On July 2, Officer Oleg Kravchun and Officer Duane Wantland set up undercover surveillance at 9602 Sharon Drive, unit 2. There was an SUV parked on the grass of the residence with a car cover over it that "matched the description" of Jones' Blazer. Sergeant Jay Taylor and Sergeant Jeff Hendrickson parked nearby in marked patrol cars. That afternoon, Officer Kravchun and Officer Wantland observed someone who resembled Jones arrive at the residence. That person and three other males were in a blue 2015 Nissan Sentra rental car.

When the Nissan left the residence, Officer Kravchun and Officer Wantland followed the car to Hague Homestead Park. The driver stopped and the occupants got out of the car. Officer Kravchun recognized the driver of the car as Mohammed Ceesay. Because Officer Kravchun knew Ceesay was prohibited from being in a park, he notified the rest of the team there was probable cause to arrest Ceesay for criminal trespassing.

The occupants of the Nissan got back in the car and drove away. Sergeant Hendrickson pulled over the Nissan after it left the park. Ceesay was driving the Nissan. Sergeant Taylor identified the passenger in the front seat as Jones. The officers placed Jones under arrest and impounded the Nissan.

Later on July 2, Detective Steve Brenneman executed an affidavit in support of probable cause to obtain a warrant to search the Nissan and the SUV. The court issued a search warrant that day. The search warrant permits the police to search the Nissan Sentra and the Chevrolet Blazer registered to Jones. The search warrant authorizes the police to seize "clothing worn during the original crime, drugs, or drug related items to include packaging and scales, cell phones, firearms, bullets, firearm related items, and rental or ownership paperwork and trace evidence to include blood, hairs, fibers, and DNA[3]."

Detective Brenneman and Detective Corey Barrows executed the search warrants that evening on July 2. Detective Brenneman found a .45 caliber semiautomatic handgun underneath the front passenger seat of the Nissan where Jones had been sitting. The officers found an Enterprise Rent-A-Car rental agreement for the Nissan, showing it had been rented by a person associated with Jones.

Richardson assembled an entirely different photomontage for the police to show Hisel. On July 7, Detective Atkins showed Hisel the photomontage. Before showing Hisel the photomontage, Detective Atkins asked whether he had seen anything in the news or on social media about an arrest in the case or heard any particular names. Hisel confirmed that his mother had shown him some Instagram[4] photos of Jones.

Detective Atkins gave Hisel a photomontage instruction form for him to read. The instruction form is identical to the one Detective Atkins showed Dawson. After Hisel read the instructions and told the detective he understood, Detective Atkins

---

[3] Deoxyribonucleic acid.
[4] Instagram is a social media platform for sharing photographs.

handed him the photomontage. Hisel identified Jones as the shooter "fairly quickly" and with certainty.

The State charged Jones with three counts of first degree assault while armed with a firearm of Dawson, Hisel, and Colon-Reyes in violation of RCW 9A.36.011(1)(a), RCW 9.94A.533(3), RCW 9.41.010, and RCW 9.94A.825; unlawful possession of a firearm in the second degree in violation of RCW 9.41.040(2); possession of a stolen firearm in violation of RCW 9A.56.310; and tampering with witness Fahie in violation of RCW 9A.72.120.

The jury convicted Jones as charged. Jones appeals.

ANALYSIS

Photomontages

Jones contends the court violated his due process rights by admitting the photomontages the police showed Dawson and Hisel. U.S. CONST. amend. XIV; WASH. CONST. art I, § 3. Jones argues the photomontages were impermissibly suggestive and created a substantial likelihood of irreparable misidentification.

Pretrial, Jones filed a motion to suppress evidence of the photomontages shown to Dawson and Hisel. Jones argued Dawson and Hisel should not be permitted to identify him in court because they lacked personal knowledge of the identity of the shooter. In the motion to suppress, Jones argued both photomontages were impermissibly suggestive and created a substantial likelihood of irreparable misidentification. Jones asserted the June 30 photomontage shown to Dawson directed undue attention to Jones' photo and the July 7 photomontage shown to Hisel took place after Hisel had already seen photos of Jones on social media.

9

Following an evidentiary hearing, the court denied the motion to suppress the photomontages and entered findings of fact and conclusions of law. The court found that the photomontages shown to Dawson and Hisel were not impermissibly suggestive. The findings state, "The Court finds nothing that would draw attention to any one photo in either photo montage." The findings also state, in pertinent part:

> The Court does not find that the fact that Mr. Hisel viewed an Instagram photo provided by a family member prior to viewing his montage is a basis to exclude the photo montage shown to him. The Court finds the Instagram photo goes to the weight the jury might give such identification versus its admissibility.

The court found that the testimony at the hearing did not support "exclusion of an in-court identification of the defendant."

In reviewing the denial of a motion to suppress, we determine whether substantial evidence supports the trial court's findings of fact and whether those findings support the conclusions of law. State v. Ross, 106 Wn. App. 876, 880, 26 P.3d 298 (2001). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding. State v. Levy, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006). We review conclusions of law on the suppression of evidence de novo. Levy, 156 Wn.2d at 733. Unchallenged findings of fact are verities on appeal. Levy, 156 Wn.2d at 733.

"An out-of-court photographic identification meets due process requirements if it is not so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification." State v. Linares, 98 Wn. App. 397, 401, 989 P.2d 591 (1999). To establish a due process violation, the defendant "bears the burden of showing that the identification procedure was impermissibly suggestive." State v.

Vickers, 148 Wn.2d 91, 118, 59 P.3d 58 (2002). If the defendant fails to meet this burden, the inquiry ends. Vickers, 148 Wn.2d at 118.

To show that a photomontage was impermissibly suggestive, the defendant "must show that the montage directs undue attention to a particular photograph." State v. Ramires, 109 Wn. App. 749, 761, 37 P.3d 343 (2002). "Minor differences in the photos are not suggestive enough to warrant further inquiry into the likelihood of misidentification." State v. Eacret, 94 Wn. App. 282, 285, 971 P.2d 109 (1999). Generally, courts find montages to be impermissibly suggestive only if "the defendant is the only possible choice given the witness's earlier description." Ramires, 109 Wn. App. at 761.

Even if a photomontage is impermissibly suggestive, it is not per se inadmissible. Vickers, 148 Wn.2d at 118. The court must examine the factors set out in Neil v. Biggers, 409 U.S. 188, 199-200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and reiterated in Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), to determine whether the identification was reliable despite the unnecessarily suggestive police procedure. Biggers states that courts should consider the following factors in determining the reliability of the identification:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Biggers, 409 U.S. at 199-200. The Supreme Court emphasized, "Short of that point, such evidence is for the jury to weigh." Brathwaite, 432 U.S. at 116.

Dawson described the shooter to the police while at the hospital. Dawson said the shooter was "a black male, 130 pounds, about five-foot-six to five-foot-eight in height." Dawson estimated the individual was 18 to 21 years old with "some facial hair." Dawson said he could not describe the shooter's hair because "the shooter was wearing a hat." After viewing the photomontage, Dawson identified Jones by his "furrowed brows" and said that was how the shooter looked right before he fired the gun. Dawson saw the shooter's face while they were arguing and the shooter was pointing the gun at him.

Substantial evidence supports the court finding the photomontage the police showed Dawson does not direct undue attention to a particular photograph. The six photos in the montage are booking photographs from the Snohomish County Jail with the same dark gray background and the individuals all appear to be wearing striped jail uniforms. The six photographs appear to be black males of a similar age and weight. Five of the people have obvious facial hair. While the individual in photo number 3 was later identified as female, that photograph does not look obviously different from the other five. The six individuals all have dark black hair, although the people in photos number 3, 5, and 6 have longer braids or dreadlocks. Further, the evidence shows Dawson's description and identification of Jones in the photomontage was accurate.

We conclude substantial evidence supports the court's finding that the photomontage shown to Dawson is not unduly suggestive. The six individuals in the photomontage shown to Hisel on July 7 appear even more similar. All six individuals appear to be black males with similar skin tone, short hair, and similar facial features. Nothing in any one photo directs undue attention to Jones.

Substantial evidence also supports the court's finding that seeing an Instagram photo of Jones before viewing the montage did not create a suggestive police procedure. Hisel testified that he saw photos related to the case on Instagram before he viewed the photomontage. But the evidence shows Detective Atkins neither showed Hisel photos of Jones before the photomontage nor directed anyone to show Hisel the Instagram photos. Detective Atkins gave Hisel the standard instructions before showing him the photomontage and she did not direct him to a single photograph. The trial court did not err in concluding that seeing the Instagram photo goes to the weight of Hisel's out-of-court identification, not its admissibility.

Because Jones did not meet his burden to show that the June 30 or July 7 photomontages constituted impermissibly suggestive police procedures, we need not address whether the photomontages created a substantial likelihood of misidentification. The trial court did not err in admitting the photomontages and permitting Dawson and Hisel to identify Jones in court.

Search Warrant

Jones argues the court abused its discretion by denying his motion to suppress the evidence the police seized from the Nissan. Jones argues the affidavit in support of the search warrant did not establish a sufficient nexus between Jones and the Nissan Sentra to establish probable cause. Jones contends the affidavit shows only the presence of Jones in the Nissan rental car.

The Fourth Amendment to the United States Constitution provides, "[N]o warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be

seized." Article I, section 7 of the Washington State Constitution prohibits government intrusion upon private affairs "without authority of law."

We review the issuance of a search warrant for an abuse of discretion and give great deference to the issuing judge or magistrate. State v. Neth, 165 Wn.2d 177, 182, 196 P.3d 658 (2008). However, because the trial court acts in an appellate capacity in a suppression hearing on a search warrant, the court's review "is limited to the four corners of the affidavit supporting probable cause." Neth, 165 Wn.2d at 182. Accordingly, we review the trial court's determination of probable cause de novo and consider only the information brought to the attention of the issuing judge or magistrate at the time the warrant was requested. State v. Chamberlin, 161 Wn.2d 30, 40-41, 162 P.3d 389 (2007); State v. Murray, 110 Wn.2d 706, 709-10, 757 P.2d 487 (1988). We evaluate search warrants in a commonsense, practical manner, rather than in a hypertechnical sense. State v. Perrone, 119 Wn.2d 538, 549, 834 P.2d 611 (1992).

"A search warrant may issue only upon a determination of probable cause." State v. Thein, 138 Wn.2d 133, 140, 977 P.2d 582 (1999); State v. Cole, 128 Wn.2d 262, 286, 906 P.2d 925 (1995).

> Probable cause exists if the affidavit in support of the warrant sets forth facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime can be found at the place to be searched.

Thein, 138 Wn.2d at 140. Probable cause requires only "a probability of criminal activity, not a prima facie showing of criminal activity." State v. Maddox, 152 Wn.2d 499, 510, 98 P.3d 1199 (2004). The affidavit in support of a search warrant "must be based on more than mere suspicion or personal belief that evidence of a crime will be found on the premises searched." Neth, 165 Wn.2d at 182-83. Probable cause

14

requires a nexus between criminal activity and the item to be seized and between the item and the place to be searched. Thein, 138 Wn.2d at 140. In determining whether probable cause exists, "the magistrate makes a practical, commonsense decision, taking into account all the circumstances set forth in the affidavit and drawing commonsense inferences." Maddox, 152 Wn.2d at 509.

The affidavit in support of the search warrant sets forth specific facts linking Jones to the June 29 shooting and the Nissan. The affidavit includes descriptions of the shooter from the witnesses. Dawson and Hisel both told the police that the shooter was the driver of the SUV. The affidavit states that Dawson described the driver of the SUV and the shooter as follows:

> [A] black male around 5'6" to 5'8" tall, 130 lbs. with a tattoo on the right side of his chest. He'd been wearing shorts, no shirt and a blue and white baseball cap turned backward. The shooter also had a short goatee. He was estimated to be 18-21 years old. The gun was described as a silver colored handgun that appeared to have a flashlight attached to it.

The affidavit states that Hisel gave the police a similar description:

> Mr. Hisel described the driver as being about 5'10" tall and skinny. He said that he appeared in his mid-twenties to early thirties. He hadn't been wearing a shirt. Mr. Hisel remembered that he'd been wearing a blue baseball cap with a green marijuana leaf on it. He also described the gun as being silver and large."

The affidavit states that video from nearby surveillance cameras confirm that a light-colored SUV appeared to be involved with the shooting.

The affidavit sets forth the information Fahie gave police about Jones. Fahie told the police that he and Colon-Reyes met up with Jones at the convenience store to buy Xanax pills from Jones. Fahie said that Jones "arrived in his gray colored Blazer." Fahie said the group left the convenience store "and headed to Taco Bell where Mr.

Jones was supposedly going to sell Xanax to someone." Fahie confirmed that Jones was the shooter:

> Mr. Fahie had been behind Mr. Jones' vehicle, but was able to see what was occurring. He said that Mr. Jones got out of the vehicle and pulled out a gun and started shooting. He said that he'd been able to see that the gun was silver and black. Mr. Fahie said that he also knew Mr. Jones to own a silver and black .45 caliber handgun. (Shell casings found on scene were .45 caliber.) Mr. Fahie further advised that Mr. Jones had recently attached a green laser to the gun, which could explain why Mr. Dawson believed the gun had a flashlight affixed to it.

Fahie also stated that Jones called him after the shooting and "told him to tell the police that it had been a random fight." The affidavit states that Fahie provided documentation of his communications with Colon-Reyes and Jones on June 29 to confirm what he told the police.

The affidavit describes the police investigation. The police verified that Jones owned a "silver, 2006 Chevrolet Blazer registered in his name (AUT3196)." The police investigated the residence that one database listed as Jones' current residence, located at 9206 Sharon Drive. The affidavit states:

> A vehicle was located under a tarp at 9206 Sharon Dr. This vehicle was completely covered but was a similar shape and size to a mid 2000's Chevy Blazer with similar stock rims to other Blazers I have seen. Additionally, other officers confirmed that the trim molding, spare tire and exhaust are the same as the vehicle seen in Jones's Facebook photos.

The affidavit states that undercover officers observed Jones leave the Sharon Drive residence in a rental car, a 2015 Nissan Sentra with the license plate AUV2866. Two other men were in the car, Ceesay and Devante Knutson. Ceesay was a "witness" to the shooting.

16

The affidavit explains what happened after the police stopped the car and contacted its occupants:

> When officers approached the car, they observed a scale and smelled Marijuana. Ceesay was questioned about the scale and he stated it was to weigh his Marijuana. He was asked his age and told officers that he was 18 years old.
>
> Ceesay and Jones were transported to the Everett north precinct for an interview. At the station it was noted that Jones had a cell phone charger with him but no cell phone. It is likely that his phone is in vehicle license AUV2866. Additionally, it is believed that Jones has used that phone to set up meeting his friends for drug sales on the night of the incident and used it to speak about the crime following the incident.

The affidavit establishes probable cause that a firearm, drugs, or a cell phone would be found in the Nissan Sentra. Jones was driving the Chevrolet Blazer on the day of the shooting, as confirmed by Dawson, Hisel, and Fahie. Fahie knew that Jones owned a .45 caliber handgun that matched the descriptions of the gun used in the shooting. After the shooting, Jones left the Chevrolet Blazer parked underneath a tarp. Just days after the shooting, Jones left his current residence in the Nissan rental car. A reasonable inference from this evidence is that after Jones committed the June 29 shooting, he hid the Chevrolet Blazer and used a different vehicle.

There is a reasonable inference from this evidence that Jones left a cell phone in the Nissan and it contained evidence of the shooting. Jones called Fahie after the shooting to control what Fahie told the police about the shooting and had a cell phone charger on his person when he was arrested.

Because the affidavit established probable cause to search the Nissan Sentra and seize evidence of the shooting, we conclude the court did not err by denying Jones' motion to suppress the evidence obtained from the search warrant.

Criminal Filing Fee

Jones challenges imposition of the $200 criminal filing fee assessed under RCW 36.18.020(2)(h). Jones argues the criminal filing fee is discretionary and the court erred by failing to inquire into his ability to pay. In State v. Gonzales, 198 Wn. App. 151, 153-55, 392 P.3d 1158 (2017), we recently considered and rejected the same argument. We adhere to our decision in Gonzales.

Jones also argues that permitting waiver of mandatory fees for civil litigants but not for criminal defendants violates equal protection. In State v. Mathers, 193 Wn. App. 913, 924-29, 376 P.3d 1163 (2016), we considered and rejected the same argument. We conclude the trial court did not err in imposing the mandatory criminal filing fee.

We affirm.

WE CONCUR: