IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 76647-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| BOX, ANTHONY LEWIS, | ) | |
| DOB: 10/26/1997, | ) | |
| | ) | |
| Appellant. | ) | FILED: October 8, 2018 |

SCHINDLER, J. — A jury convicted Anthony Lewis Box of one count of vehicular homicide and three counts of vehicular assault. Box seeks reversal. Box argues the court erred in denying his motion to suppress evidence of his blood test results. Box claims probable cause did not support the decision to issue the search warrant to obtain a blood sample. Alternatively, Box claims his attorney provided ineffective assistance of counsel by failing to request a Franks[1] hearing. Because probable cause supported the decision to issue the search warrant and Box cannot show ineffective assistance of counsel, we affirm.

---

[1] Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

## FACTS

On November 12, 2015, 17-year-old Dakota Rogert went with her friend 17-year-old Madison Whiddon and Madison's 14-year-old sister Emma Whiddon to their house after school.[2] Madison's best friend 18-year-old Anthony Box arrived at Madison's house in his 2000 Volkswagen Jetta later that afternoon. Fourteen-year-old Cassandra "Cassie" Mattila joined the group at the Whiddon house that evening. Cassie brought several cans of Dust-Off. Dust-Off is an aerosol dust cleaner that is used on electronic devices such as keyboards. Dust-Off contains the chemical difluoroethane. Inhaling Dust-Off can result in "euphoria." Inhaling Dust-Off can also result in "confusion, dizziness, sedation, sometimes loss of memory, or loss of consciousness."

After Cassie arrived with the Dust-Off, Madison, Emma, and Cassie went to Madison's bedroom to inhale Dust-Off. Box and Dakota stayed in the living room and watched television. Madison, Emma, and Cassie then joined Box and Dakota in the living room and they "all" inhaled Dust-Off.

Cassie said inhaling Dust-Off gave her "a head rush" and made her feel "[h]igh" and unable to "function" for about a minute. In the past, inhaling Dust-Off caused Cassie to become unconscious.

Emma said inhaling Dust-Off made her feel "[l]ightheaded and kind of woozy," "the room was spinning," and she "couldn't really . . . see what was going on and hear what was going on." At one point, Emma "blacked out" for "a couple seconds" from inhaling too much.

---

[2] We refer to Madison Whiddon, Emma Whiddon, Dakota Rogert, and Cassandra Mattila by their first names for purposes of clarity.

Dakota said inhaling Dust-Off made her feel "stuck in this loop of hearing the same thing." It was a "good feeling" that lasted about "30, 40 seconds."

The group decided to go to the Walmart in Monroe to "get more Dust-Off." Box drove. Emma sat in the front passenger seat of the Jetta. Madison, Cassie, and Dakota were in the back seat. On the way to the Walmart, Madison, Cassie, and Box inhaled Dust-Off. Emma told Box to stop "because it wasn't safe for anybody in the car." At one point, Emma saw Box "pretend to pass out" and "his head kind of rolled down." Emma "grabbed the wheel." Box picked up his head, laughing.

At the Walmart, Emma and Cassie stole five cans of Dust-Off, returned to the car, and "gave a can to each person." They each inhaled Dust-Off while sitting in the parking lot before leaving to drive back to Sultan. Box drove. Madison was sitting in the front passenger seat. Dakota was sitting in the left rear passenger seat, Emma was in the right rear passenger seat, and Cassie was sitting in the middle.

Box had a can of Dust-Off "[i]n his hand" and continued to inhale Dust-Off as he drove from Walmart to United States Route 2 (US-2). After the Jetta turned onto US-2 east, Box put the Dust-Off can to his mouth and inhaled "two . . . or three more times." Madison, Emma, Cassie, and Dakota were also inhaling Dust-Off and Madison was spraying the Dust-Off "in the air" of the car.

As the Jetta approached the intersection of US-2 and Sofie Road, Box lost consciousness. Dakota saw Box "slumped over, like, he had passed out." The car continued to accelerate and "veered" off US-2. At the west edge of Sofie

3

Road, the Jetta "went airborne" over Sofie Road with all four tires off the ground. The car "vaulted" over the guardrail on the east side of Sofie Road and hit the ground nose-down "in a gully." The car then rolled over several times before coming to a stop.

Cassie had passed out from inhaling Dust-Off. Cassie woke up when she felt the front tire of the Jetta start "going off road." Cassie "looked up" and saw Box "completely unconscious" before the car "went over the guardrail." Emma heard "the rivets in the road" and then the car "kind of swoop[ed] down into, like, the grass part." Emma felt her "hair float up" as the car went airborne over Sofie Road. Dakota "felt" the "bumpy" roadway before the Jetta "caught air."

Madison, Cassie, and Emma were ejected from the Jetta. Madison landed face-up on the detached windshield of the Jetta. Cassie woke up face-down in the "sticker bushes" with Emma "partially on top" of her. Cassie tried to get up and "walk around, but [her] back hurt." When Emma regained consciousness, her shoes "had flown off" and she was "very confused." Emma was "in a lot of pain." Emma "couldn't stand up" or "feel" her right arm.

Box and Dakota had been wearing seat belts and remained buckled in their seats when the Jetta landed. When Dakota regained consciousness, she got out of the car, saw Madison on the ground, and tried to help her. Madison was "laying on her back" and "there was blood coming out of her mouth." Madison had suffered severe and fatal head trauma.

Box and Dakota tried "moving sticker bushes out of the way" to make a path back up to US-2 but "couldn't" find "a way up." Dakota, Cassie, and Box got in the backseat of the Jetta and called 911.

Fire crews, medics, and Washington State Patrol (WSP) Trooper Andrew Robertson arrived at approximately 11:00 p.m. Trooper Robertson "heard a scream yelling 'over here' " and saw the car "had gone over the guardrail off Sofie Road down in the ditch." Fire crews "cut down through a whole bunch of sticker bushes that are on the side of the road to get to the car." The fire crews reported one person was dead and others were "seriously injured."

The fire crews brought Box up to the road first. Medics examined Box while he sat on the guardrail facing the fire truck lights. Trooper Robertson asked Box "what happened." Box was "kind of dazed. He didn't really remember." Box told Trooper Robertson that "he was driving, and then . . . woke up in the ditch." Trooper Robertson examined Box's eyes. His pupils were dilated and his eyes "were a lot wider than they should have been."

> As [Box] was facing, sitting on the guardrail right there facing the fire trucks, which had all their lights on, it's incredibly bright, I noticed that his pupils appeared to be dilated, which is not really normal with that much light. They're going to want to tighten up and constrict.

Trooper Robertson asked Box if he had been drinking. Box said he "was not intoxicated" and agreed to take a breath test.

Medics took Box to a Monroe hospital. Fire crews removed Emma, Dakota, and Cassie on backboards and medics transported them to a regional medical center in Everett.

Emma was in pain, her "face was severely swollen," and she had "several cuts and scratches on her face." Emma had "several transverse process fractures of her back" or "the kind of wings that stick off to the side," a low back spine fracture, and a rib fracture. All of the fractures were "stable" and did not require surgery, only "symptom control, primarily pain control." But as a result of a concussion, she went into a seizure at the emergency room.

Dakota had a "severe gash in her forehead," was in pain, and she had suffered a concussion. Dakota had "fractures to her skull" and her frontal sinus underneath the "very large laceration" that extended from her forehead down the left side of her face.

> [A] fracture was to what is considered the frontal sinus. That's the forehead area of your skull, there's a pocket of air in that region. It's very hard bone, but in her situation, that bone was cracked and pushed in. We call that a depressed fracture.

Medics took Dakota to Harborview Medical Center to treat the injuries to her "head and face." Surgeons used plates and pins to put "the bone back flush with . . . its typical position."

Cassie was "in a lot of pain" and her face was "severely swollen." Cassie was transported to Harborview to treat the "extensive facial fractures" on the right side of her face, including "fractures of the eye socket, the cheekbone, the upper and lower jaw, and she also had a facture of her jaw on the left side." Surgeons put the "broken bones into position" by holding the bones together "with little titanium plates and screws." The doctors "had to temporarily wire her teeth shut to make sure [they] got the alignment right and then plate the jaw fractures." After repairing the fractured eye socket, the surgeons had to reposition Cassie's

eyeball and "put a little piece of plastic . . . on the bottom of her eye socket to help hold her eye up in position."

Trooper Robertson and other WSP troopers examined the crash site. The troopers "found tire tracks" on the west side of Sofie Road and "a lot of dirt" on the road that indicated the Jetta went "up over Sofie Road, up and over the guardrail, and into the ditch" on the east side that runs parallel with US-2. The front bumper of the car "had made a crater in the ground" when it landed nose-down and "cartwheeled."

After WSP Sergeant Chris Caiola arrived, Trooper Robertson went to the hospital to talk to Box "because we're still investigating this crash." Trooper Robertson contacted a drug recognition expert, "which is protocol when there's a serious injury or fatality crash." While at the hospital, Sergeant Caiola called Trooper Robertson to report there were "multiple cans of Dust-Off" found "around and inside the vehicle." Dust-Off is "commonly used as an inhalant . . . to get high off what's in the can."

Certified drug recognition expert Trooper John Axtman arrived at the hospital at approximately 12:45 a.m. on November 13. Trooper Axtman examined Box. Box "had bloodshot eyes and droopy eyelids." Box agreed to perform "field sobriety tests" (FSTs), including the "horizontal gaze nystagmus test," the "Romberg balance test," and the "finger-to-nose test." Trooper Axtman concluded Box was impaired.

Trooper Robertson prepared an affidavit in support of a search warrant to obtain a blood sample from Box for testing. The affidavit states there is probable

cause to believe Box committed vehicular homicide by driving in a reckless manner in disregard for the safety of others while under the influence of drugs or alcohol. Trooper Robertson requested authority to obtain a blood sample from Box to determine blood alcohol level and the presence of marijuana "or any drug."

The affidavit states that "approximately 100 yards" before Sofie Road, the Jetta "crossed over Sofie Rd and launched over a guardrail." After landing on the other side of the guardrail, the Jetta "proceeded to roll multiple times," traveling an additional 50 to 75 yards. Trooper Robertson stated "multiple occupants" were ejected and "[a]t least one of the occupants is confirmed deceased."

Trooper Robertson states that Box's eyes were obviously dilated and he could not remember what happened before waking up in the ditch. The affidavit states the police found several cans of Dust-Off, a substance recreationally abused as an inhalant, in and around the Jetta.

At 2:37 a.m. on November 13, the district court judge issued a search warrant authorizing a blood draw from Box for purposes of testing. At 2:52 a.m., a laboratory technician obtained two vials of blood from Box. The Washington State Patrol Crime Laboratory (WSPCL) tested the blood samples and found the presence of difluoroethane.

The State charged Box with vehicular homicide of Madison and three counts of vehicular assault of Dakota, Cassie, and Emma.

Box filed a motion to suppress the blood test results. Box argued probable cause did not support issuing the search warrant because the affidavit

did not state whether drug recognition expert Trooper Axtman had any "specialized training" and no facts supported his conclusory statement that Box was impaired. The court denied the motion to suppress. The findings of fact and conclusions of law state, in pertinent part:

> After review of the search warrant and supporting affidavit dated November 13, 2015 approved by Judge Goodwin, attached to both the State and defense memorandums, and considering the totality of the facts stated in the warrant affidavit, including the nature of the defendant's driving, physical evidence found at the scene of the collision, the defendant's statements made to law enforcement, his physical appearance, and the opinion of the Drug Recognition Expert, the court concludes that the warrant affidavit established probable cause to believe that the defendant was driving under the influence of an impairing substance and that evidence of that impairing substance would be found in his blood.

A number of witnesses testified at the March 2017 trial, including Dakota, Cassie, Emma, WSP troopers, a collision reconstruction expert, WSPCL forensic scientists, and Box.

WSP collision reconstruction expert Detective Kevin Nelson testified the approach to Sofie Road on US-2 is "a fairly straight roadway" with "rumble strips cut into the center line and the fog line." Detective Nelson testified there was no evidence of "evasive steering" or "any braking" for approximately 365 feet "from the time . . . the vehicle left the roadway until the end of the tire tracks before Sofie road." Detective Nelson testified the Jetta "went airborne" at the west "edge of Sofie Road" and went over Sofie Road and the guardrail with "[a]ll four tires off the ground" for approximately 120 feet before landing "nose down" in the ditch approximately 10 feet below US-2.

> Q      And what did that do to the front seat passenger, [Madison], do you believe, the force of the impact?

9

A    The force of the impact, the people in the car are also going that same direction.  So on the force of the vehicle, hit the ground, stops the car, the people inside of the car are still moving in that same direction; right?  And it pushed [Madison]'s body through the windshield onto the ground.

Detective Nelson testified the car then continued to somersault "end-over-end" for approximately 95 feet before coming to a stop.  "[T]he total distance from when the vehicle left the road to its point of rest" was approximately 580 feet, or "[a]lmost two football fields."

The car was "severely damaged."

[T]he front end was severely damaged, pushed — the front end was pushed back into the firewall area.  The front bumper cover was ripped off.  The entire windshield was out of the car.  The entire windshield was out of the vehicle.  The roof of the car was actually ripped open and ripped up. . . . The front passenger seat appeared to have been broken off its mounts and pushed forward into the dash and kind of through the windshield area.

Detective Nelson testified that the crash "is consistent with doing freeway speeds, 55, 60 miles an hour."

WSPCL forensic scientist Elizabeth Wehner testified the blood sample from Box contained difluoroethane.  Wehner described the effects of inhaling the "aerosol propellant" difluoroethane that is used in cans of Dust-Off.  Wehner testified Dust-Off is "typically . . . being used in order to achieve a euphoria or a well-being" and "has to be breathed in" to "be effective."  Wehner testified the side effects of inhaling difluoroethane are "euphoria, which is why someone would typically use it.  And then you can also see things like confusion, dizziness, sedation, sometimes loss of memory, or loss of consciousness."  Wehner said that "[t]ypically, the high is just a few minutes," and difluoroethane can "have

some sedative effect past that point." Wehner testified difluoroethane is "classified as a central nervous system depressant. So it's depressing the central nervous system, which consists of your brain and then your spinal cord." Wehner testified:

> There have been case studies that have shown that individuals who are intentionally abusing this substance have lost consciousness. And these have typically either been driving cases that I've seen where someone would lose consciousness and then crash their vehicle or have their vehicle come to a stop.

Box admitted that on November 12, he inhaled Dust-Off and got high at least five times at Madison's house. Box said it was the first time he inhaled Dust-Off. Box said that he planned to use more Dust-Off after they got back from Walmart. But contrary to the testimony of Emma, Dakota, and Cassie, Box denied inhaling Dust-Off on the way to Walmart, in the Walmart parking lot, or while driving back to Sultan. Box testified Madison sprayed Dust-Off "in my face twice" while he was driving "and that's the last thing I remember until I woke up" in the ditch.

The jury convicted Box as charged of vehicular homicide of Madison and vehicular assault of Emma, Dakota, and Cassie.

## ANALYSIS

### Denial of Motion to Suppress

Box seeks reversal, arguing the court erred in denying his motion to suppress the blood test results. Box asserts the affidavit did not establish probable cause to issue a search warrant to obtain a blood sample for testing.

11

The Fourth Amendment to the United States Constitution provides, "[N]o warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Article I, section 7 of the Washington State Constitution prohibits government intrusion upon private affairs "without authority of law."

"A search warrant may issue only upon a determination of probable cause." State v. Thein, 138 Wn.2d 133, 140, 977 P.2d 582 (1999); State v. Jackson, 150 Wn.2d 251, 264, 76 P.3d 217 (2003). Probable cause exists if the affidavit in support of the warrant "sets forth facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime can be found at the place to be searched." Thein, 138 Wn.2d at 140. Probable cause requires only "a probability of criminal activity, not a prima facie showing of criminal activity." State v. Maddox, 152 Wn.2d 499, 510, 98 P.3d 1199 (2004). Probable cause is the proper criteria for judicial authorization of an order for a blood sample. State v. Kalakosky, 121 Wn.2d 525, 536, 852 P.2d 1064 (1993); State v. Neth, 165 Wn.2d 177, 182-83, 196 P.3d 658 (2008).

We review de novo the legal conclusion of the trial court on a motion to suppress. State v. Martines, 184 Wn.2d 83, 90, 355 P.3d 1111 (2015). Generally, we review the issuance of a search warrant only for an abuse of discretion, giving great deference to the issuing judge or magistrate. Neth, 165 at 182. We evaluate a search warrant in a commonsense, practical manner rather than in a hypertechnical sense. State v. Perrone, 119 Wn.2d 538, 549,

12

834 P.2d 611 (1992). Because the trial court acts in an appellate capacity in a suppression hearing on a search warrant, trial court review "is limited to the four corners of the affidavit supporting probable cause." Neth, 165 Wn.2d at 182. Therefore, although we defer to the magistrate's determination of probable cause to issue a search warrant, we review de novo "the trial court's assessment of probable cause" and consider only the information brought to the attention of the issuing judge or magistrate at the time the warrant was requested. Neth, 165 Wn.2d at 182; State v. Chamberlin, 161 Wn.2d 30, 40-41, 162 P.3d 389 (2007); State v. Murray, 110 Wn.2d 706, 709-10, 757 P.2d 487 (1988).[3]

Without regard to the conclusory statement in the affidavit that the drug recognition expert believed Box was intoxicated, the facts and circumstances of the crash, the observations of Box after the crash, and finding the cans of Dust-Off at the crash site establish the reasonable inference that Box was under the influence of drugs when he drove the car off the highway in reckless disregard of the safety of the passengers.

In State v. Mee Hui Kim, 134 Wn. App. 27, 33-35, 139 P.3d 354 (2006), the court concluded that "given the circumstances of the collision," there were reasonable grounds to believe the defendant was driving under the influence even before an officer smelled alcohol. The evidence showed the collision "occurred shortly after the bars closed at 2:00" a.m., the defendant "had to overcome a number of significant physical barriers to get onto Highway 99 and

---

[3] Because our review is de novo, we do not address arguments challenging the reasoning of the trial court.

drive in the wrong direction," and "she drove the wrong way for some distance."

Mee Hui Kim, 134 Wn. App. at 35.

Here, the affidavit describes the crash in detail:

The vehicle, a red 2000 Volkswagen Jetta, was traveling east on [US-2] approaching Sofie Road. Based on the observations on scene the vehicle appeared to have left the roadway approximately 100 yards prior to Sofie Rd. The vehicle crossed over Sofie Rd and launched over a guardrail. It apparently landed on the other side of the guardrail and proceeded to roll multiple times, traveling approximately 50-75 more yards ejecting multiple occupants. Based on the nature of the collision and the observations on the scene I believed the vehicle had been driven in a reckless and dangerous manner prior to the collision. Fire crews cleared a path through sticker bushes next to the railroad tracks to the victims in the crash. The first person AID brought to the roadway was later identified as Anthony L. Box (DOB 10-26-1997). At least one of the occupants is confirmed deceased at this time.

Trooper Robertson also describes his observations of Box and the police finding cans of Dust-Off.

The facts supporting my belief that **Anthony L. Box** is under the influence of intoxicating liquor, marijuana, or any drug and/or is affected by intoxicating liquor, marijuana or any drug are as follows:

I spoke with Box and asked him what had happened. He told me he was driving and that the vehicle was his. Box told me he had just recently purchased the vehicle. He couldn't tell me what had happened but that he remembered waking up in the ditch. While speaking to him I was able to look at his eyes. I observed that his pupils were dilated. I asked Box if he had been drinking and he informed me he was not intoxicated. Sergeant Caiola advised that he was able to locate at least three cans of "Dust Off" which is known to be used as an inhalant. [Box] submitted to voluntary field sobriety tests while at Evergreen Hospital. Trooper Axtman, a [drug recognition expert], advised that based on his contact with Box and the observation of the FST's he believed Box was impaired.

14

Ineffective Assistance of Counsel

Box argues his attorney provided ineffective assistance by failing to request a Franks[4] hearing to show there were material omissions in the affidavit.

A criminal defendant has the right under the Sixth Amendment to the United States Constitution to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). There is a strong presumption that counsel's representation was effective and competent. State v. McNeal, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). Legitimate trial strategy or tactics cannot be the basis for an ineffective assistance of counsel claim. McNeal, 145 Wn.2d at 362.

To demonstrate ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. Strickland, 466 U.S. at 687; State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). To establish ineffective assistance of counsel, the defendant must satisfy both deficient performance and prejudice. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

A search warrant is invalid "if the warrant affiant recklessly or intentionally makes material misstatements or omissions." State v. Chenoweth, 160 Wn.2d 454, 478-79, 158 P.3d 595 (2007). If the defendant makes a preliminary showing of a material omission, the defendant is entitled to a Franks evidentiary hearing. State v. Ollivier, 178 Wn.2d 813, 847, 312 P.3d 1 (2013). If the defendant establishes a material omission, the court must include the omitted information and then assess the sufficiency of the affidavit. Ollivier, 178 Wn.2d at 847. An

---

[4] Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

omission or misstatement must be both (1) reckless or intentional and (2) material. State v. Gentry, 125 Wn.2d 570, 604, 888 P.2d 1105 (1995). Negligence or innocent mistakes are insufficient to invalidate the warrant. State v. Clark, 143 Wn.2d 731, 751, 24 P.3d 1006 (2001).

Box cites Trooper Robertson's testimony at trial to support his argument that the affidavit omitted facts that could have shown Box had a concussion. No evidence supports the argument that Box had a concussion.

During cross-examination, Trooper Robertson stated that he noticed Box had a "cut over his left eye" and told Box he might be "in shock." Trooper Robertson said it was "safe" to assume Box "probably struck his head." But Trooper Robertson did not testify Box's pupils were different sizes. Trooper Robertson testified that as Box was sitting on the guardrail, facing the fire trucks, he examined Box's eyes. Pupils of the eyes that are different sizes can indicate a concussion. Box's pupils were dilated and wider than normal. The testimony established medics examined Box before taking him to the hospital and medical personnel examined him in the emergency room. Neither the medics nor the hospital medical personnel testified Box had a concussion. Certified drug recognition expert Trooper Axtman testified that when he examined Box at the hospital, Box "had equal pupil size." Trooper Axtman said that he looks for "equal pupil size" because "if we have someone who has unequal pupil size, that could be a red flag that there's a possible head injury. And that's something that I would want to notify a physician about immediately."

Further, Box did not testify that he had a concussion or felt confused after the crash. Instead, Box admitted that as he sat on the guardrail, he was thinking clearly and "pretty quick." Because no evidence suggests that Box had a concussion, Box cannot show ineffective assistance of counsel.

We conclude probable cause supported issuance of the warrant to obtain a blood sample from Box and Box cannot show ineffective assistance of counsel. We affirm the jury convictions of one count of vehicular homicide and three counts of vehicular assault.

WE CONCUR: